### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

---

**MOHAMMAD HILMI NASSIF & PARTNERS**

> **Plaintiff,**

> **v.**

**REPUBLIC OF IRAQ, et al.**

> **Defendants.**

---

**Civil Action No.
1:17-cv-02193 (KBJ/GMH)**

### MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

The Complaint in this matter alleges that, in 1995, Defendant Republic of Iraq ("Iraq") owed Plaintiff Mohammad Hilmi Nassif & Partners, a Jordanian entity, money for an outstanding debt. To satisfy this debt, Iraq and co-Defendant Ministry of Industry and Minerals of the Republic of Iraq ("Ministry") agreed to ship 450,000 tons of sulfur and 100,000 tons of urea ("the product") to Plaintiff. Plaintiff's plan was to then sell the product to a U.S. buyer and retain the proceeds from the sale to satisfy Iraq's debt. Defendants, however, failed to ship the product, and the sale to Plaintiff's U.S. buyer fell through. For that alleged breach of their agreement, Plaintiff won a judgment in Jordanian court against the Defendants in the amount of $53 million. Plaintiff now seeks recognition of that judgment in the United States under the District of Columbia's Uniform Foreign-Country Money Judgments Recognition Act of 2011 ("D.C. Recognition Act"), D.C. Code § 15-361 *et seq.*

After Plaintiff filed the Complaint, Defendants defaulted and remained unresponsive for over eleven months. Faced with the threat of default judgment, Defendants appeared and filed a motion to set aside the Clerk's entry of default pursuant to Rule 55(c) of the Federal Rules of Civil

Procedure and a motion to dismiss the Complaint pursuant to Rules 12(b)(1), 12(b)(5), and 12(b)(6). Then-District Judge Ketanji Brown Jackson referred this case to the undersigned for full case management. On January 15, 2020, the undersigned issued a Report and Recommendation recommending that the Court find that Plaintiff failed to properly serve Defendants because the envelope Plaintiff mailed to Defendants containing copies of the summons and Complaint failed to identify the head of the Ministry of Foreign Affairs by name or title, as required by the Foreign Sovereign Immunities Act ("FSIA") for proper service under 28 U.S.C. § 1608(a)(3). ECF No. 40 at 25–26. The undersigned further recommended that Plaintiff be permitted to reattempt proper service, that Defendants' motion to set aside entry of default be granted, that Plaintiff's amended motion for default judgment be denied as moot, and that, should the Court reach the merits of Defendants' motion to dismiss under 12(b)(1) and 12(b)(6), the motion be denied. *Id.* at 35. Judge Jackson adopted the Report and Recommendation in part, finding that Plaintiff had failed to properly serve Defendants pursuant to section 1608(a)(3) and allowing them to reattempt proper service. *See Mohammad Hilmi Nassif & Partners v. Republic of Iraq*, No. 17-cv-1444918, at *2–3 (D.D.C. Mar. 25, 2020) [hereinafter, *Nassif*]. Judge Jackson also granted Defendants' motion to set aside entry of default, denied Plaintiff's amended motion for default judgment as moot, and denied without prejudice Defendants' motion to dismiss. *Id.* at *4. Because service was ineffective, Judge Jackson "set the [Report and Recommendation's] conclusions [as to Defendants' motion to dismiss] aside—to be consulted, if necessary, once the complaint is properly served and Defendants refile their motion to dismiss." *Id.* at *3.

Plaintiff served Defendant Republic of Iraq on August 26, 2020 and Defendant Ministry of Industry and Minerals on September 15, 2020. *See* ECF No. 57. Defendants then filed a renewed motion to dismiss the Complaint pursuant to Rule 12(b)(1), Rule 12(b)(6), and on *forum non*

*conveniens* grounds.  Defendants' renewed motion raises many of the same arguments included in their first motion to dismiss but provides some new evidence and arguments, as well.  ECF No. 60-1.  The motion is now ripe for adjudication.  After reviewing the parties' briefs and attachments thereto, the undersigned recommends denying Defendants' renewed motion to dismiss.[1]

## I.    BACKGROUND

The undersigned's prior Report and Recommendation (ECF No. 40) and Judge Jackson's opinion adopting it in part, *see Nassif*, 2020 WL 1444918, at *1, set out the relevant factual background of this case.  Only a brief review is necessary here.  In November 1995, Defendants allegedly agreed to ship 450,000 tons of sulfur and 100,000 tons of urea to Plaintiff to settle an outstanding debt that Iraq owed to Plaintiff.[2]  ECF No. 1, ¶¶ 2, 10–11.  After receiving the product, Plaintiff would sell it to a U.S. buyer and retain the proceeds from the sale, thus settling the debt. *Id.*, ¶ 12.  The only written memorialization of the contract's terms is a letter ("Export Commitment Letter," or "Letter") dated November 22, 1995, signed by Yakoub Yousef Shonia, the then–Director General of the Ministry's Economic Department, and addressed to Plaintiff's tradename, "Trust Worldwide Trading Corporation."  ECF No. 66 at 15; ECF No. 1, ¶ 1.  The Letter states in relevant part, "[W]e have no objection to settle the entitlements by supplying you with 450000 (four hundred fifty thousand tons) of sulfur and 100000 (one hundred thousand tons) of urea as a repayment of the debt.  The said materials are to be exported via the Iraq-Jordan borders."  ECF No. 66 at 15.  According to Plaintiff, Defendants knew at the time of contracting that Plaintiff would ship the

---

[1] The most relevant docket entries considered by the undersigned with respect to the motion to dismiss are (1) the Complaint (ECF No. 1) and its attachments, (2) Defendants' motion to dismiss (ECF No. 60) and its attachments, (3) Plaintiff's opposition to the motion to dismiss (ECF No. 66) and its attachments, and (4) Defendants' reply in support of their motion to dismiss (ECF No. 67) and its attachments.  The page numbers cited herein are those assigned by the Court's CM/ECF system.

[2] The facts presented are based on Plaintiff's allegations, which Defendants have not disputed.  *See* ECF No. 60-1 at 12.

product to a U.S buyer and that the only way Defendants' debt would be satisfied was through such a sale. *Id*. at 14–15. By February 1996, Plaintiff was ready to ship the product to a New York company who it had contracted with for the sale of the sulfur and urea. *Id*. at 15. Defendants, however, failed to deliver either the sulfur or urea to Plaintiff. *Id*.

Faced with this breach of contract, starting around June 1997 and ending around late 2008 or early 2009, Plaintiff's representatives met in person with Iraqi government officials on several occasions to discuss both the agreement and Defendants' failure to deliver the promised product. *Id*. at 15–16. During those meetings, Plaintiff alleges that the officials reviewed the Export Commitment Letter and orally assured Plaintiff's representatives that the contract was valid and enforceable and that, should Defendants continue to fail to uphold their end of the bargain, Plaintiff could sue Defendants anywhere, including in the United States, and Defendants would not dispute the lawsuit. *Id*. at 16. Despite these oral assurances, Defendants never shipped the product. *Id*.

In November 2010, Plaintiff sued Defendants in Jordanian court for breaching the contract. *Id*. And again, in late 2011 or early 2012, the then-head of the Ministry told one of Plaintiff's representatives that "Iraq would not release any money unless [Plaintiff] ha[d] a court order" from the "Middle East, Europe, or the United States," and that "Iraq would not and could not dispute the lawsuit at all." *Id*. (alterations in original). In September 2015, the Jordanian court found Defendants jointly and severally liable for breaching the agreement to ship the product and awarded Plaintiff $53 million in damages. ECF No. 1, ¶ 16; *see* ECF No. 1-2 at 3–16. In a subsequent proceeding seeking to execute the September 2015 judgment by attaching Iraqi monies and property located in Jordan, an appellate court in Jordan concluded that Defendants had not waived sovereign immunity with respect to that proceeding against its property in Jordan. ECF

Nos. 60-1 at 31–33, 60-4 at 6–7; ECF No. 66 at 35–36.  To date, neither Defendant has paid any portion of the judgment.  ECF No. 66 at 16.

On October 23, 2017, Plaintiff filed the present suit for recognition of the Jordanian judgment under the D.C. Recognition Act.  ECF No. 1.  Defendants missed their deadlines for responding to the Complaint.  ECF No. 33 at 7.  Thus, the Clerk of the Court entered default against them. ECF No. 15.  Over eleven months later, and after Plaintiff filed an amended motion for default judgment (ECF No. 24), Defendants appeared and filed a motion to dismiss the Complaint (ECF No. 28) and a motion to set aside entry of default (ECF No. 29).  Those motions were adjudicated in January and March 2020.  *See* ECF No. 40 (the undersigned's January 2020 Report and Recommendation); *Nassif*, 2020 WL 1444918, at *5 (Judge Jackson's March 2020 Memorandum Opinion adopting in part the January 2020 Report and Recommendation).  In accordance with Judge Jackson's Memorandum Opinion and Order, Plaintiff reattempted proper service under the FSIA.  In August 2020, Plaintiff requested the Clerk of the Court effect service pursuant to 28 U.S.C. § 1608(a)(3) on each Defendant by sending, via FedEx, one copy of the summons, complaint, and notice of suit, together with a translation of each into the official language of the foreign state, to the head of the ministry of foreign affairs.  *See* ECF Nos. 52–53.  Both envelopes were addressed to Mr. Faud Hussein, Iraq's Minister of Foreign Affairs, curing the error in Plaintiff's first attempt at service under section 1608(a)(3).  ECF Nos. 57–58.  After proper service was made (*id.*), Defendants filed a renewed motion to dismiss in November 2020.  ECF No. 60.

In their renewed motion, Defendants again allege lack of subject-matter jurisdiction on foreign sovereign immunity grounds and failure to state a claim upon which relief can be granted because the parties' commercial contract purportedly violated the United States' sanctions against Iraq that were in place when the parties entered the contract.  ECF No. 60-1 at 10–11.  Defendants

also add a new argument that the case should be dismissed on *forum non conveniens* grounds.  ECF No. 60-1 at 11.  In response, Plaintiff maintains that Defendants explicitly waived sovereign immunity in Plaintiff's oral conversations with senior Iraqi officials, that the United States' sanctions against Iraq are not a basis for dismissal under 12(b)(6), and that controlling Circuit law forecloses Defendants' *forum non conveniens* argument.  ECF No. 66 at 16.  Notably, many of Defendants' arguments and Plaintiff's responses regarding dismissal under 12(b)(1) and 12(b)(6) were before the undersigned in Defendants' first motion to dismiss and addressed in the January 2020 Report and Recommendation.  Those recommendations were not addressed by Judge Jackson because she found that the "undisputed service defect [ ] render[ed] the [ ] arguments in Defendants' pending motion to dismiss moot."  *Nassif*, 2020 WL 1444918, at *4–5.  Accordingly, Defendants having renewed those same arguments, much of the analysis here concerning those issues is substantially similar to the undersigned's prior Report and Recommendation.

## II.     LEGAL STANDARDS

### A.     Rule 12(b)(1)

"The established standard for evaluating a motion to dismiss under Rule 12(b)(1) in a case that implicates the FSIA is a nuanced one."  *SACE S.p.A. v. Republic of Paraguay*, 243 F. Supp. 3d 21, 32 (D.D.C. 2017).  This Court and the D.C. Circuit have ably set out that standard in prior cases.  To begin, "a foreign state is 'presumptively immune from the jurisdiction of United States courts unless a specific exception [under the FSIA] applies.'"  *Id.* at 31 (quoting *TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1, 7–8 (D.D.C. 2013)).  Once a plaintiff meets that initial burden, "the sovereign [then] bears the ultimate burden of persuasion to show the exception does not apply."  *Id.* (quoting *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013)).  In attempting to meet that burden of persuasion, a defendant "'may

challenge either [1] the legal sufficiency' of the allegations that appear on the face of the complaint 'or [2] the factual underpinning of [the] exception' upon which the plaintiff relies, or both." *SACE*, 243 F. Supp. 3d at 32 (alterations in original) (quoting *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).

"[H]ow the district court proceeds to resolve the motion to dismiss depends upon whether the motion presents a factual challenge" or a legal challenge. *Phoenix Consulting*, 216 F.3d at 40. If the defendant disputes the facts underlying the complaint, then "the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant. Instead, the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Id.* at 40. Importantly, a preliminary determination early in the litigation denying a foreign sovereign's motion to dismiss asserting sovereign immunity "is 'not a conclusive determination' but is 'instead subject to change in light of further development of the facts.'" *Dentons U.S. LLP v. Republic of Guinea*, 410 F. Supp. 3d 194, 206 (D.D.C. 2019) (quoting *Price v. Socialist People's Libyan Arab Jamajiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004)); *see also I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1188 (D.C. Cir. 2003) (same). "If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." *Phoenix Consulting*, 216 F.3d at 40. Thus, "[t]o survive such a [legal] challenge, the complaint's allegations, 'if true, must show that the defendant's conduct falls within the ambit of at least one of the FSIA's exceptions to sovereign immunity.'" *SACE*, 243 F. Supp. 3d at 33 (quoting *Agrocomplect, AD v. Republic of Iraq*, 524 F. Supp. 2d 16, 21 n.8 (D.D.C. 2007)).

### B.     Rule 12(b)(6)

To withstand a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although a court must assume the veracity of the complaint's factual allegations and construe them in the light most favorable to the plaintiff, a court need not accept a plaintiff's conclusory assertions or legal conclusions.  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.  Notably, "a Rule 12(b)(6) motion does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim." *Coulibaly v. Kerry*, 213 F. Supp. 3d 93, 123 (D.D.C. 2016).  Accordingly, a plaintiff is "not required to anticipatorily negate" an affirmative defense in its complaint.  *McNamara v. Picken*, 866 F. Supp. 2d 10, 17 (D.D.C. 2012); *see Chem-Met Co. v. Metaland Int'l, Inc.*, No. Civ. A. 96-2548, 1997 WL 74541, at *2 (D.D.C. Feb. 19, 1997) (noting that the Federal Rules of Civil Procedure "only require a plaintiff to set forth a short, plain statement of its claims; they do not require a plaintiff to anticipate affirmative defenses which might be raised by a defendant").

### C.     *Forum Non Conveniens*

To successfully argue that dismissal is warranted on *forum non conveniens* grounds, the moving party must show that (1) an adequate alternative forum for the dispute is available and (2) balancing the private and public interest factors strongly favors dismissal.  *Agudas Chasidei Chabad v. Russian Federation*, 528 F.3d 934, 950 (D.C. Cir. 2008).  To guide trial court discretion in balancing the private and public interest factors, the Supreme Court has provided a non-exhaustive list of private factors, which recognize that certain "practical [considerations] [can] make trial of a case easy, expeditious and inexpensive[,]" and considers "the relative ease of access to sources

8

of proof; [ ] availability of compulsory process for attendance of unwilling, and the cost of obtain-ing attendance of willing, witnesses," as well as public interest factors, which recognize that "[a]dministrative difficulties follow for courts when litigation is piled up in congested centers in-stead of being handled at its origin" and consider whether the litigation impacts a particular com-munity or many persons, whether the litigation is one of localized controversy, and whether the case is governed by state law that courts in the home forum are best suited to apply. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09 (1947).

### III.     DISCUSSION

For the reasons stated below, this Court should deny Defendants' motion to dismiss.  There is sufficient unrebutted evidence to find at this stage of the litigation that Defendants explicitly waived sovereign immunity and that this Court therefore has subject-matter jurisdiction.  Further-more, this Court should reject Defendants' arguments to dismiss for failure to state a claim upon which relief can be granted and on *forum non conveniens* grounds.

### A.     Dismissal Under Rule 12(b)(1)

The FSIA affords "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).  Under the FSIA, a foreign state[3] "is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  Plaintiff relies on two potential exceptions to sovereign immunity as a basis for suit here:  explicit waiver[4] under 28

---

[3] The FSIA defines the term "foreign state" for purposes of the Act as including "a political subdivision of a foreign state or an agency or instrumentality of a foreign state.  *See* 28 U.S.C. § 1603.  Here, Plaintiff does not dispute that the FSIA applies to both Defendants. *See* ECF No. 1 ¶¶ 3–4; ECF No. 66 at 18–38.  Thus, this Court need not address this issue.

[4] A foreign state may also implicitly waive its immunity.  28 U.S.C. § 1605(a)(1).  Plaintiff, however, argues only that Defendants have explicitly waived their immunity and asserts that implicit waiver is irrelevant to this case.  *See* ECF

U.S.C. § 1605(a)(1), and the third clause of the commercial activities exception under 28 U.S.C. § 1605(a)(2).

For the reasons that follow, the undersigned finds that Plaintiff has met its burden of production to show that Defendants here, the Republic of Iraq and its Ministry of Industry and Minerals, explicitly waived their sovereign immunity from suit in the United States. The undersigned further finds that Defendants have not, at this time, met their burden of persuasion by showing either that the Complaint's allegations fail to provide a legally sufficient basis for finding that Defendants explicitly waived sovereign immunity or that there is an absence of a factual basis for such conclusion. This Court may end its inquiry there and deny Defendants' motion to dismiss for lack of subject-matter jurisdiction. Nevertheless, the undersigned will also address the commercial activities exception, as well as Defendants' argument that waiver cannot be based on the parties' contract because the contract violated United States sanctions against Iraq.

1.      Explicit Waiver of Sovereign Immunity

"In general, explicit waivers of sovereign immunity are narrowly construed 'in favor of the sovereign' and are not enlarged 'beyond what the language requires.'" *World Wide Minerals, Ltd. v. Rep. of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002) (quoting *Library of Cong. v. Shaw*, 478 U.S. 310, 318 (1986)). Thus, a foreign state "will not be found to have [explicitly] waived its immunity unless it has clearly and unambiguously done so." *World Wide Minerals*, 296 F.3d at 1162 (citing *Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1292 (11th Cir. 1999)). "An express waiver under section 1605(a)(1) must give a clear, complete, unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity." *Id.* (quoting

---

No. 66 at 25 ("Plaintiff's argument, to be clear, is that Defendants *explicitly* waived immunity."). Thus, this Court need not address implicit waiver.

*Aquamar S.A.*, 179 F.3d at 1292).  The purpose of requiring explicit waiver is to preclude "unintended [or inadvertent] waiver."  *Libra Bank Ltd. v. Banco Nacional de Costa Rica, S.A.*, 676 F.2d 47, 50 (2d Cir. 1982).  To establish that the explicit waiver exception to sovereign immunity applies, Plaintiff must "come[ ] forward with [adequate supporting evidence] to carry its burden of production" that Defendants have explicitly waived sovereign immunity; Defendants then must "shoulder the burden of persuasion" to show that they have not explicitly waived sovereign immunity.  *SACE*, 243 F. Supp. 3d at 32.  Defendants may challenge "the legal sufficiency of [Plaintiff's] jurisdictional allegations," "the factual basis of the court's jurisdiction," or both.  *Phoenix Consulting*, 216 F.3d at 40.  Recall that, where a defendant raises a factual challenge, the court must go beyond the pleadings and "resolv[e] the factual disputes between the parties."  *Erby v. United States*, 424 F. Supp. 2d 180, 183 (D.D.C. 2006) (quoting *Valentin v. Hospital Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001)).

Defendants' motion to dismiss raises both factual and legal challenges to the allegations contained in Plaintiff's Complaint. Defendants' factual challenge is that the Iraqi officials whose statements Plaintiff relies on to allege waiver of sovereign immunity lacked the authority to waive sovereign immunity under Iraqi law.  Defendants' legal challenges are that (1) to be effective, an explicit waiver of sovereign immunity must be in the parties' commercial contract, or, at minimum, in writing and contain the words "waiver" or "immunity;" (2) even if sovereign immunity can be waived orally, the statement must still include the words "waiver" or "immunity;" (3) international comity and *res judicata* weigh in favor of this Court deferring to a Jordanian court's decision concluding that Defendants did not waive sovereign immunity; and (4) even if the Court determines that the Iraqi officials did waive sovereign immunity as to the Export Commitment Letter,

an additional waiver of "execution" immunity, which Plaintiff has failed to allege, is necessary for these proceedings.

The following discussion first addresses Plaintiff's evidence in support of explicit waiver, and Defendants' factual challenge to that evidence, then addresses whether Defendants' legal challenges to Plaintiff's allegations show that there is no legal basis for finding explicit waiver. For the sake of clarity, the undersigned will address the factual dispute and the legal disputes separately in Parts III.A.1.a. and III.A.1.b.

> a.   *Plaintiff's Evidence of Explicit Waiver and Defendants' Factual Challenge*

In support of its argument that Defendants explicitly waived sovereign immunity, Plaintiff provides a number of declarations, detailing the following statements allegedly made by three Ministers of the Ministry of Industry and Minerals of Iraq, a former President of the Iraqi Governing Council of Iraq, and the Director General of the Ministry of Industry and Minerals' Economic Department:

> "On or about June 1997, . . . [the Iraqi Minister of Industry and Minerals,] Adnan Al-Ani, . . . said that [Plaintiff] had the right to sue Iraq on the [Export Commitment] Letter, that it had the right to sue Iraq anywhere on this obligation and that Iraq would not object to being sued anywhere.  In fact, the Minister expressly informed [Plaintiff's representative] that, if [Plaintiff] was to sue, [it] should not sue in Iraq, should stay out of the Arab states and should sue elsewhere.

ECF No. 24-3 at 3, ¶¶ 10–11, 14.

> [In] September 2003, [the then-]President of the Iraqi Governing Council, [Ahmed Chalabi,] read the [Export Commitment] Letter and confirmed that it was indeed an unconditional undertaking and that it was a valid commercial obligation of the Republic of Iraq. . . .  He agreed that it was [Plaintiff's] right to sue and that there was no limitation in the Letter requiring [Plaintiff] to sue in Iraq.  In fact, he stated that the Letter was a valid, unconditional obligation and that it could be enforced against Iraq anywhere . . . .

ECF No. 24-5 at 4–5, ¶¶ 19, 21, 25–26.

> [On or about March 2006,] Yakoub Yousef Shonia [Counsel for the Ministry's Economic Department and the Iraqi official who signed the Export Commitment Letter as Director General of the Economic Department] . . . reviewed the Letter, recalled well his signing of the same and stated that . . . [Plaintiff] had the right to sue Iraq anywhere to enforce its rights under the Letter, whether in the Middle East, Europe or the United States. . . . [I]n fact, Mr. Shonia stated that Iraq and the Ministry would have no defense to any such lawsuit by [Plaintiff].

ECF No. 24-6 at 2–3, ¶¶ 4–5, 7–8; *see also id.* at 13.

> [I]n the winter of 2008-2009 . . . the Minister of Industry and Minerals of the Republic of Iraq, Fawzi Franco Hariri, . . . told [Plaintiff's representative] that, in order to collect [on the debt], [Plaintiff] would have to bring a lawsuit.  He also said that [Plaintiff] may sue Iraq and the Ministry anywhere it wants—including in the Middle East, Europe or the United States . . . .

ECF No. 24-3 at 3, ¶¶ 10–11.

> In the winter of 2011-2012 . . . the subsequent Minister of Industry and Minerals of the Republic of Iraq, Ahmad Al Karbouli, . . . [stated] that [Plaintiff] may sue Iraq and the Ministry anywhere it would like, [and] that Iraq would not and could not dispute the lawsuit at all . . . .  Mr. Karbouli actually explained . . . [that Plaintiff] should sue Iraq and the Ministry in any country, [and] that Iraq and the Ministry would not and could not dispute the suit . . . .

*Id.* at 3–4, ¶¶ 13–15.  Put simply, Plaintiff has offered evidence that, on multiple occasions, five senior Iraqi government officials told Plaintiff that it could sue Defendants anywhere in the world and Defendants would not object and would have no defense to such suit.

At this point in the proceedings, Defendants' do not dispute that those statements were made.  So, accepting those statements as true, the Court must assess, as an initial matter, whether they provide "adequate supporting evidence" sufficient to support Plaintiff's burden of production demonstrating an explicit waiver of Defendants' sovereign immunity under section 1605(a)(1). *SACE S.p.A.*, 243 F. Supp. 3d at 33; *Bell Helicopter*, 734 F.3d 1175, 1183 (D.C. Cir. 2013) ("[T]he plaintiff bears the initial burden to overcome [the presumption of immunity] by producing evidence that an exception applies.").  As this Court has observed, the "meaning of 'burden of production' here is not wholly self-evident, as that term usually refers to the amount of evidence a

party must present to allow an issue to go to a jury—a concern not directly applicable in the jury-less context of FSIA cases." *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 276 (D.D.C. 2016). But this Court has explained that the "usual meaning suggests a burden akin to the requirements of 'substantial evidence' in administrative law." *Id.*

> The point is: the bar is relatively low. Yes, the existence of the burden of production means that the plaintiff must provide *some* evidence that could convince a fact-finder of the jurisdictional fact in question. But because the ultimate burden of persuasion lies with the defendant, in cases where the defendant offers little or no evidence of its own, even a meager showing by the plaintiff will suffice. It is for this reason that the D.C. Circuit has adverted to the "risk[ ]" run by a FSIA "defendant that chooses to remain silent."

*Id.* (alteration in original) (quoting *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 361 (D.C. Cir. 2006)). Defendants run that risk here as they have not, as yet, disputed that the senior Iraqi officials in question made the statements attributed to them by Plaintiff. The question then is whether that evidence is sufficient to meet the "relatively low"—indeed, the "meager showing"—necessary to satisfy Plaintiff's burden of production. *Id.*

The undersigned finds that it is sufficient. Taking the repeated statements of senior Iraqi officials at face value, while they do not use the words "waiver" or "sovereign immunity," they quite clearly permit Plaintiff to sue Defendants in the United States to enforce the parties' contract, *see, e.g.,* ECF No. 24-6 at 3, ¶ 7 ("[Plaintiff] ha[s] the right to sue Iraq anywhere to enforce its rights under the [Export Commitment] Letter, whether in the Middle East, Europe or the United States."); *id.* at 3, ¶ 11 ("[Plaintiff] may sue Iraq and the Ministry anywhere it wants—including in the . . . United States . . . ."); *see* ECF No. 24-3 at 3, ¶ 14 ("Plaintiff ha[s] the right to sue Iraq on the Letter, [ ] it ha[s] the right to sue Iraq anywhere on this obligation[,] and [ ] Iraq would not object to being sued anywhere."); ECF No. 24-5 at 5, ¶ 26 ("[T]here [is] no limitation in the Letter requiring [Plaintiff] to sue in Iraq. In fact, . . . the Letter [is] a valid, unconditional obligation and

[ ] it could be enforced against Iraq anywhere . . . ..”); ECF No. 24-6 at 4, ¶ 15 (“[Plaintiff] should sue Iraq and the Ministry in any country . . . .”), and they waive *any* defenses or objections Defendants may have to such a lawsuit, *see, e.g.*, ECF No. 24-6 at 3, ¶ 8 (“Iraq and the Ministry would have no defense to any such lawsuit by [Plaintiff].”); *id.* at 4, ¶ 14 (“Iraq would not and could not dispute the lawsuit at all . . . .”).  Notably, at this point in the proceedings, Defendants do not argue that the Iraqi officials who made the alleged statements were unfamiliar with the concept of sovereign immunity when the statements were made, nor do Defendants dispute that their statements addressed whether and where Plaintiff could sue Defendants for breach of the parties’ alleged agreement.[5]

However, Defendants do assert that the Iraqi officials on whose statements Plaintiff relies lacked actual authority to waive sovereign immunity under Iraqi law because the alleged waivers here were neither in writing nor properly authorized by the Republic of Iraq.  ECF No. 60-1 at 19–20, 25–31; *see SACE*, 243 F. Supp. 3d at 34 (considering, as a factual challenge, the defendant’s argument that the record failed to demonstrate that the government official had authority to act on behalf of the foreign state).  As a preliminary matter, Defendants are correct that actual authority, rather than apparent authority, is required for waiver of sovereign immunity.  This Court has previously “conclude[d] that ‘the foreign state’ as that phrase appears in 28 U.S.C. § 1605(a)(1) encompasses only agents of the foreign state who are *actually* authorized to waive sovereign immunity.”  *SACE*, 243 F. Supp. 3d at 39.  “[T]he FSIA ‘unambiguously indicate[s] that only official acts, i.e. acts actually authorized by “the foreign state,” can invoke the [waiver] exception. . . .’”

---

[5] In reply, Defendants suggest that the statements merely “acknowledg[e] that there was no venue provision [in the contract]” (ECF No. 67 at 14), but that ignores Defendants’ additional statements that they would not object to suit anywhere and would not assert a defense to suit anywhere.  Taking those statements at face value, they encompass a waiver of far more than just a defense of improper venue.

*Id.* at 38 (second and third alterations in original) (quoting the record).  Accordingly, the Iraqi officials who made the statements on which Plaintiff relies to establish a waiver of sovereign immunity must have possessed actual, rather than merely apparent, authority under Iraqi law to waive Iraq's sovereign immunity.  The question, then, is what the present factual record shows with respect to the Iraqi officials' authority under Iraqi law to waive sovereign immunity.  *See, e.g.*, *TJGEM*, 26 F. Supp. 3d at 9–10 (addressing the question of whether "the foreign state" engaged in conduct that would constitute a waiver of sovereign immunity by looking to whether the official who engaged in the conduct was empowered under the foreign state's laws to bind the foreign state).

Under the Federal Rules of Civil Procedure, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1.  "Most often, foreign law is established through 'written or oral expert testimony accompanied by extracts from foreign legal material.'"  *Chin-Teh Hsu v. New Mighty U.S. Tr.*, No. 10-CV-1743, 2020 WL 588322, at *3 (D.D.C. Feb. 6, 2020) (some internal quotation marks omitted) (quoting *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 240 (D.D.C. 2012)).  But "[s]uch expert testimony is intended [only] to aid the court in determining the content of the law, not in applying that law to the facts of the case." *Id.* (quoting *Estate of Botvin*, 873 F. Supp. 2d at 240).  Defendants and Plaintiff have both submitted declarations from Iraqi lawyers and government officials describing Iraqi law, custom, and practice with respect to waivers of sovereign immunity.[6]  A review

---

[6] The undersigned finds, based on the qualifications described in each of the declarations—that is, the reply Declaration of Hannan Munther Niseaf (ECF No. 67-2), the Declaration of Hassan Salman Hassan Hassan (ECF No. 66-3), and the Declaration of Dhaif Abdulmajeed Ahmed Al-Tekreeti (ECF No. 66-2)—that each declarant, at least at this stage of the proceedings, has made enough of a showing that they would qualify as an expert on Iraqi law under Federal Rule of Evidence 702. Ms. Niseaf has served as General Director of Iraq's Ministry of Justice Legal Department since 2005.  ECF No. 67-2 at 2.  She received her law degree in 1991 and worked in the legal department of the Iraqi Cabinet Secretariat from 1992 until 2003.  *Id.*  Between 2016 and 2019, Ms. Niseaf avers that she "served as a

of Plaintiff's declarations establishes that it has met its burden of production at this stage of the proceedings to show that the officials who made the statements waiving sovereign immunity had the authority to do so under Iraqi law at the time they were made.

Plaintiff first provides the declaration of Hassan Salman Hassan Hassan. Mr. Hassan avers that he is a citizen of the Republic of Iraq and an attorney specializing in Iraqi law and international law. ECF No. 66-3 at 2. According to Mr. Hassan, "[t]he President of the Republic of Iraq [and ministers of any constituent Ministry of the Republic of Iraq] ha[ve] always had the full authority to waive the sovereign immunity of the Republic of Iraq [and its Ministries] in any matter" and "th[at] authority is not circumscribed by the Ministry of Justice or by any other government body." *Id.* at 3. Mr. Hassan further avers that "[t]here is no Iraqi law or custom and practice in Iraq,[7] and there has been no Iraqi law or custom and practice in Iraq at all relevant times in [this matter], that provides that waivers of sovereign immunity must be in writing." *Id.* Indeed, according to Mr. Hassan "[a]t all relevant times in [this] matter," that is, during the time period that the statements upon with Plaintiff relies were made, "waivers of sovereign immunity could have been made orally by the President of the Republic of Iraq or any Ministers of the Republic of Iraq." *Id.*

Plaintiff also submits a declaration from Dhaif Abdulmajeed Ahmed Al-Tekreeti, the Secretary General of the Iraqi Forum for Intellectuals and Academics. *Id.* at 2. Mr. Al-Tekreeti states that "[f]rom 1970 to 1975, [he] served at the Ministry of Industry and Minerals of the Republic of

---

consultant to the Iraqi State Council and as a member of the Supreme Administrative Court, where [she] drafted legislation and prepared legal opinion and judgments." *Id.* Mr. Hassan graduated from law school in 1969 and has 49 years of experience practicing, teaching, and consulting on Iraqi law and international law. ECF No. 66-3 at 2. Mr. Al-Tekreeti is the Secretary General of the Iraqi Forum for Intellectuals and Academics and has served in a number of high-level positions in the Iraqi government since 1970, including with the Military Industry Commission of the Republic of Iraq, Military Defense Commission, Presidential Office of the Republic of Iraq, and the Ministry of Foreign Affairs. ECF No. 66-2 at 2–3.

7 The declarations at issue repeatedly refers to Iraqi custom and practice because, under Iraqi law "[i]n the absence of any applicable legislative provisions in the law the court[s] [in Iraq] [ ] adjudicate according to custom and usage." ECF No. 60-3 at 2 (first alteration in original).

Iraq"; [f]rom 1975 until 1997, [he] served at the Military Industry Commission of the Republic of Iraq"; "[f]rom 1993 to 1995, [he] served as Deputy Director-General at the Military Defense Commission"; and in 1995, "[he] became the Director-General of the Military Defense Commission." *Id.* at 2–3.  In addition, "[f]rom 1997 to 2001, [he] served as Deputy Head of the Presidential Office of the Republic of Iraq" and "[f]rom 2001 to 2004, [he] served at the Ministry of Foreign Affairs." *Id.* at 3.  During his time with the Ministry of Foreign Affairs, Mr. Al-Tekreeti explains that he "served as Ambassador of the Republic of Iraq to the Republic of Belarus" and "served as a Member of the Council of Ministers of the Republic of Iraq." *Id.*  Mr. Al-Tekreeti avers that he is aware of Iraqi customs and practices "involving the waiver of sovereign immunity[ ] throughout the 1990s and 2000s" because of his "dealings with private companies, [in which] waiver of sovereign immunity was an important consideration." *Id.*  According to Mr. Al-Tekreeti, it was "never [ ] a recognized custom or practice within the government of Iraq, in [his] experience, throughout the 1990s and 2000s, that waivers of sovereign immunity be in writing or that a written memorialization of any oral waiver be recorded with the legal department of the Ministry of Justice." *Id.*  Mr. Al-Tekreeti claims that "in [his] experience, throughout the 1990s and 2000s," the custom and practice was "that the head of a ministry and the head of state of the Republic of Iraq [could] indeed waive sovereign immunity as to a particular matter and may do so orally or in writing," and had "full authority" to do so. *Id.* at 3–4.  In fact, Mr. Al-Tekreeti says that he remembers speaking about the Export Commitment Letter with Adnan Al-Ani—one of the officials whose statement Plaintiff relies on to establish explicit waiver of sovereign immunity—in 1997 when Mr. Al-Ani was the Minister of Industry and Minerals of the Republic of Iraq. *Id.* at 4.  According to Mr. Al-Tekreeti, he and Minister Al-Ani "discussed that [Plaintiff] had the right to sue Iraq on the Letter, that it had the right to sue Iraq anywhere on [the letter] and that Iraq would not object to being

18

sued by [Plaintiff] anywhere." *Id.* Together, this evidence is sufficient to meet Plaintiff's rela-
tively low burden of production at this stage of the proceedings that Iraqi officials with actual
authority waived sovereign immunity here.

The burden then shifts to Defendants to demonstrate by a preponderance of the evidence
that there is no factual basis for concluding that Defendants explicitly waived sovereign immunity
because the Iraqi officials whose statements Plaintiff relies on lacked the authority to waive sov-
ereign immunity under Iraqi law. ECF No. 60-1 at 19–20, 25–31. To meet their burden, they rely
on two declarations from Hanan Munther Niseaf, the General Director of the Legal Department
for the Ministry of Justice for the Republic of Iraq, to support their argument that the Iraqi officials
here lacked the authority to waive sovereign immunity. Ms. Niseaf's overarching point is that the
oral statements on which Plaintiff relies should not be credited by the Court because, to be legally
authorized, "Iraqi law and Iraqi government custom and practice require that waivers of sovereign
immunity by the Republic of Iraq and its Ministries must be in writing." ECF No. 60-3 at 2. As
support, she makes certain pronouncements about Iraqi custom and practice requiring a written
record of official actions and cites certain provisions from the Iraqi Civil Code governing the use
of extrinsic evidence in contract cases (the particulars of which are discussed below). *Id.* at 2–4.
But the declaration suffers from a fundamental shortcoming: as Plaintiff emphasizes, Ms. Niseaf's
declaration is "irrelevant to the actual waivers in this matter" because "[e]ven if [her declaration]
were to correctly describe Iraqi custom and practices [today] . . . it does not attest to the nature of
Iraqi 'custom and practice' *at the time the oral statements were made*, which . . . was over twenty
years ago." ECF No. 66 at 32. So, "[a]t [ ] best, [Ms. Niseaf's Declaration] describes the possible
'custom and practice' presently and makes no reference whatsoever as to the custom and practice
as to waiver at the time of the oral statements." *Id.* Nor does the declaration make any

19

representation that the provisions of the Iraqi Civil Code cited were in force at the time of the waivers. That same deficiency plagues her second declaration, which still does not provide any explanation regarding what the Iraqi custom or law required with respect to waivers of sovereign immunity during the 1990s and 2000s. *See generally* ECF No. 67-2. Instead, Ms. Niseaf notes that Iraq joined the United Nations Convention on Immunities of States and their Property in 2015 ("U.N. Convention"), which requires such waivers to be in writing or made in open court. *Id.* at 3–4. But that misses the point. What Iraqi custom and law required as of 2015 does not show what was required in the 1990s and 2000s when the alleged oral statements by Iraqi officials were made here.

There are further significant deficiencies in Ms. Niseaf's declarations. Her explication of Iraqi custom and practice is imprecise and confused. As noted, she asserts that "Iraqi government custom and practice require that waivers of sovereign immunity by the Republic of Iraq and its Ministries must be in writing." ECF No. 60-3 at 2. But what exactly Ms. Niseaf means by that statement is unclear: does Iraqi custom and law require a written authorization by the Republic of Iraq before an Iraqi government official may waive sovereign immunity or does it mandate that only written waivers of sovereign immunity by Iraqi government officials are operative, or both? Review of the rest of Ms. Niseaf's declaration does little to clarify the matter. Her declaration at first suggests that all that Iraqi law and/or custom requires is some "official [written] record of the alleged action" and thus the Iraqi officials only lacked authority to orally waive sovereign immunity if there was no official written record of such waiver. ECF No. 60-3 at 3. But then she suggests that not just any written record would be sufficient to waive sovereign immunity; instead, such waiver would have had to be part of the parties' contract. *Id.* (noting that if Defendants "had actually agreed to a wavier of [ ] sovereign immunity . . . that had to be stated explicitly in the

written Export Commitment Letter itself, or in a written amendment or addendum to the Export Commitment Letter").  Still later in her declaration Ms. Niseaf suggests that neither some written record nor a waiver provision in the Export Commitment Letter alone would be enough, but rather a more official, written memorialization by the Ministry of Justice would be required because waiver of "sovereign immunity is within the exclusive power of the Ministry of Justice." *Id.*  Ms. Niseaf then explains that she "found no legal opinion rendered by the Ministry of Justice that the Republic of Iraq and its Ministry could be sued in the United States in connection with this matter"; thus, the "Iraqi government officials [here] lacked actual authority to allegedly orally waive [ ] sovereign immunity." *Id*.  So, it is clear enough that Ms. Niseaf does not believe the Iraqi officials here had the authority to waive sovereign immunity, but it is not clear if that is because Iraqi custom simply prohibits oral waivers of sovereign immunity that are not recorded, because there was no waiver provision in the Export Commitment Letter, or because only the Ministry of Justice may waive sovereign immunity.[8]

Ms. Niseaf's citation of provisions of the Iraqi Civil Code is similarly unconvincing.  ECF No. 60-3 at 3–5.  Specifically, she points to three provisions of Iraqi contract law—Article 486, which she asserts provides, "Evidence may be used to establish *other than contractual obligations*"; Article 489, which she asserts provides, "Evidence may not be adduced to prove contractual obligations even where the amount claimed is not more than 10 dinars in the following cases: (a) that which contradicts or *is in excess of that which is contained in a written proof*"; and Article 490, which she asserts provides: "(1) Evidence may be adduced to prove matters of contractual

---

[8] Plaintiff points out that "[Ms.] Niseaf [ ] fail[ed] to explain how she performed the search [for legal opinions related to the matter], where she performed the search, what she did to try to find the 'record[,]' how such 'records' are kept, how many such 'records' are on file, and when such 'records' started being kept."  ECF No. 66 at 32.  Therfore, "the fact that [Ms.] Niseaf cannot find a 'written record' of the waiver of sovereign immunity by 5 government officials some 20 years ago" may not mean anything, "especially since there is not a single averment in [her] [d]eclaration that such was the custom and practice in the 1990s and 2000s." *Id.*  It is thus unclear whether the search Ms. Niseaf engaged in was adequate and would have been likely to turn up any relevant documents.

obligations even where the value of the claim exceeds 10 dinars *if there is a basis of proof in writing*," and "(2) A *basis of proof in writing is every writing issued by the adversary* which tends to render the existence of the right claimed a near probability."  ECF No. 60-3 at 4.  Ms. Niseaf explains that "the alleged oral statements by [the] Iraqi government officials constitute [extrinsic evidence] seeking to add terms [to] the [Export Commitment Letter]" and that Iraqi contract law requires such evidence to be in writing.  *Id.*  But the cited provisions do not say that waivers of sovereign immunity must be made explicit in a commercial contract, nor does Ms. Niseaf suggest that the cited provisions require that.  Indeed, the cited code provisions do not address principles of sovereign immunity at all, but rather of Iraqi contract law.  More, Plaintiff does not argue that the commercial contract included the relevant waiver of sovereign immunity, it argues that the oral statements of Iraqi officials waived sovereign immunity.  And U.S. courts have found that a foreign state may explicitly waive its immunity after a lawsuit arising from a commercial contract commences.  *See, e.g.*, *Aquamar*, 179 F.3d at 1283, 1292–1300 (holding that a foreign state explicitly waived its immunity where one of its ambassadors wrote a letter purporting to do so after the complaint was filed); *see also Ashraf-Hassan v. Embassy of France in the U.S.*, 40 F. Supp. 3d 94, 100 (D.D.C. 2014) (noting that the foreign state in that case "may have expressly waived its immunity in its initial pleading").  Hence, a foreign state could, consistent with section 1605(a)(1), waive its immunity after entering into a commercial contract, provided that such a waiver is explicit.  Thus, Plaintiff does not, as Defendants suggest, "seek[ ] to add terms [to] the [Export Commitment Letter]" and Iraqi law governing such efforts is not relevant.

Ms. Niseaf also asserts that "there could have been no waiver of foreign sovereign immunity nor agreement to the jurisdiction of the courts in the United States, because it would have violated Iraqi law" that states that "foreigner[s] shall be tried before the courts of Iraq . . . where

the subject of the adjudication is a contract which has been executed in . . . Iraq." ECF No. 60-3 at 5 (emphasis omitted).  But that argument proves too much:  it would mean that there could be no waiver of sovereign immunity as to Iraqi contracts, which is not a principle even Defendants have espoused here.  In any event, it is not clear how the Iraqi courts' jurisdiction to try *foreigners* has any bearing on whether Iraqi law permits Defendants to waive Iraq's sovereign immunity from suit.  Plaintiff does not suggest that, had it breached the contract, Defendants could not have sued it in Iraq; thus, this case simply does not implicate an Iraqi court's jurisdiction over a foreigner in a contract dispute.

In sum, the present factual record is insufficient to find that Defendants have carried their burden of demonstrating by a preponderance of the evidence that Iraq has not explicitly waived its sovereign immunity in this case.  Rather, the record supports only the following factual findings at this time:  Defendants and Plaintiff executed the Export Commitment Letter in November 1995 and Defendants agreed to ship certain products to Plaintiff to satisfy their debt; Defendants did not ship those products; following Defendants failure to ship the products, five different senior Iraqi government officials—the Minister of Industry and Minerals, the President of the Iraqi Governing Council, the Director General of the Ministry's Economic Department, and two subsequent Ministers of Industry and Minerals—stated, on multiple occasions between June 1997 and the winter of 2011-2012, that the Export Commitment Letter was valid and that Plaintiff could sue Iraq to enforce the Letter in any court, including in the United States, and Defendants would neither object nor have a defense to such suit; at the time those statements were made in the 1990s and 2000s, Mr. Hassan and Mr. Al-Tekreeti contend that Iraqi custom and practice permitted and recognized oral waivers of sovereign immunity; Mr. Hassan and Mr. Al-Tekreeti also maintain that during the 1990s and 2000s, the head of the Republic of Iraq and the Ministers of the Republic of Iraq's

Ministries had full authority to orally waive sovereign immunity; Mr. Al-Tekreeti, a former Iraqi government official familiar with the concept of sovereign immunity, remembers discussing the Export Commitment Letter with Minister Al-Ani in 1997 and recalls that they agreed that Iraq could be sued anywhere and would not object to such suit; and as of 2015, according to Ms. Niseaf, Iraqi custom appears to have become that waivers of sovereign immunity must be in writing or be made in open court, as evidenced by Iraq joining the U.N. Convention in that year.

"These findings are not conclusive, and they remain 'subject to change in light of further developments of the facts.'" *Dentons U.S.*, 410 F. Supp. 3d at 215 (quoting *Price*, 389 F.3d at 197). Nevertheless, they constitute the undersigned's findings of fact for the purposes of the pending motion, based on the record before the Court, and they support Plaintiff's theory that the Iraqi officials had the actual authority to orally waive sovereign immunity at the time the statements were made and did in fact waive sovereign immunity. Defendants have simply failed to provide sufficient evidence to the contrary. They have not disputed that the operative oral statements were made, have not disputed that the President of the Iraqi Governing Counsel and various Ministers of Iraq's Ministries would have been familiar with the concept of sovereign immunity, have not disputed that these officials were discussing whether Iraq could be sued by Plaintiff, and most notably, have offered no evidence suggesting that the Iraqi custom or law in the 1990s and 2000s required waivers of sovereign immunity to be in writing or were within the exclusive authority of the Ministry of Justice. And Defendants failed to do so even after Plaintiff pointed out that rather significant flaw in Ms. Niseaf's first declaration.

So, accepting the statements included in Plaintiff's declarations as true, and finding at this point in the proceedings that the Iraqi officials had authority to waive sovereign immunity, the undersigned finds that those statements provide "adequate supporting evidence" of explicit waiver

of Defendants' sovereign immunity under section 1605(a)(1). *SACE*, 243 F. Supp. 3d at 33. The statements unambiguously permit Plaintiff to sue Defendants in the United States to enforce the contract and waive any defense or objection to such suit. ECF No. 24-6 at 3, ¶ 7 ("[Plaintiff] ha[s] the right to sue Iraq anywhere to enforce its rights under the [Export Commitment] Letter, whether in the Middle East, Europe or the United States."); *id.* at 3, ¶ 11 ("[Plaintiff] may sue Iraq and the Ministry anywhere it wants—including in the . . . United States . . . ."); *see* ECF No. 24-3 at 3, ¶ 14 ("Plaintiff ha[s] the right to sue Iraq on the Letter, [ ] it ha[s] the right to sue Iraq anywhere on this obligation[,] and [ ] Iraq would not object to being sued anywhere."); ECF No. 24-5 at 5, ¶ 26 ("[T]here [is] no limitation in the Letter requiring [Plaintiff] to sue in Iraq. In fact, . . . the Letter [is] a valid, unconditional obligation and [ ] it could be enforced against Iraq anywhere . . . .."); ECF No. 24-6 at 4, ¶ 15 ("[Plaintiff] should sue Iraq and the Ministry in any country . . . ."). More, they waive any defense or objections Defendants may have to such a lawsuit. *See, e.g.*, ECF No. 24-6 at 3, ¶ 8 ("Iraq and the Ministry would have no defense to any such lawsuit by [Plaintiff]."); *id.* at 4, ¶ 14 ("Iraq would not and could not dispute the lawsuit at all . . . ."). Accordingly, the undersigned finds that Plaintiff has met the "relatively low bar" of "provid[ing] *some* evidence that could convince a factfinder of the jurisdictional fact in question," *Owens*, 174 F. Supp. 3d at 276 (emphasis added). Defendants, on the other hand, have failed to carry their burden of demonstrating "the absence of a factual basis" for finding that they' explicitly waived sovereign immunity and had the actual authority to do so.

b.    *Defendants' Legal Challenges to Plaintiff's Allegations*

Defendants' legal challenges to Plaintiff's assertion of explicit waiver of sovereign immunity will be considered next. Defendants maintain that, even if Plaintiff's allegations concerning the oral statements of senior Iraqi officials are true, they are legally insufficient, under U.S. law, to bring this case within the FSIA's explicit waiver exception. Defendants first contend that those

oral statements should be disregarded because the FSIA requires explicit waivers of sovereign immunity to be in a contract, or, at minimum, to be in writing and use the words "waiver" or "immunity." ECF No. 60-1 at 16–18, 22–25. The argument fails. The text of section 1605(a)(1) contains no such requirement, and "[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (quoting *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004)). "[W]hen [a] statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Sebelius v. Cloer*, 569 U.S. 369, 381 (2013) (second alteration in original) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)). Thus, courts "will not read into [a] statute a mandatory provision that Congress declined to supply." *Ill. Pub. Telecomms. Ass'n v. FCC*, 752 F.3d 1018, 1023 (D.C. Cir. 2014); *see also Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 412 (2011) ("In interpreting a statute, '[o]ur inquiry must cease if the statutory language is unambiguous' . . . and 'the statutory scheme is coherent and consistent.'" (first alteration in original) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997))). Here, the FSIA's plain text contains no express requirement that explicit waivers be in writing or in the parties' commercial contract. Rather, section 1605(a)(1) states only that a foreign state may "explicitly" waive its immunity. 28 U.S.C. § 1605(a)(1). "Explicit" means "[c]lear, open, direct" and "[e]xpressed without ambiguity or vagueness; leaving no doubt." *Explicit*, Black's Law Dictionary (11th ed. 2019). So, neither the statute's language nor the commonly understood meaning of "explicit" requires a writing for a waiver to be deemed explicit. An oral waiver may be explicit— or not—as well. Although the absence of a written waiver of sovereign immunity may present

proof problems for a plaintiff, section 1605(a)(1) does not impose a writing requirement.  More, Defendants have not cited any cases holding that explicit waiver *must* be in writing; they have only cited cases that concluded a written, express waiver was sufficient.[9]  *See* ECF No. 60-1 at 24–25.

Switching gears somewhat, Defendants point to the FSIA's legislative history to support their argument that the waiver must be in the contract.  They emphasize a passage in the House Report issued when the FSIA was enacted explaining that, "[w]ith respect to explicit waivers, a foreign state may renounce its immunity . . . in a contract with a private party."  ECF No. 60-1 at 22–24 (quoting H.R. Rep. 94-1487, at 6617 (1976)).  Defendants reliance on this single statement from the FSIA's legislative history is unpersuasive. As a preliminary matter, courts do not "al-low[ ] ambiguous legislative history to muddy clear statutory language." *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011).  Indeed, it is well-established that "[i]n interpreting a statute, '[the court's] inquiry must cease if the statutory language is unambiguous' . . . and 'the statutory scheme is coherent and consistent.'" *Schindler Elevator*, 563 U.S. at 412 (2011) (quoting *Robinson*, 519 U.S. at 341).  Such is the case here.  But even assuming that the statute's plain text is ambiguous as to whether an explicit waiver must be in a written contract, which it is not, the passage Defend-ants cite does not do the work they ask of it.  Rather, it merely provides one example of explicit waiver, not a requirement that such waiver must be in a written contract.

Defendants also point to *Argentine Republic*, a Supreme Court case finding that a contract that "contain[ed] no mention of a waiver of immunity to suit" could not constitute a waiver of sovereign immunity.  ECF No. 60-1 at 16 (emphasis omitted) (quoting *Argentine Republic*, 488

---

[9] Defendants' argument that no other case has ever concluded oral statements could constitute explicit waiver is of no help to them, either.  *See* ECF No. 60-1 at 24–25.  The absence of a case could simply mean that no court has had the opportunity to consider the issue.  Tellingly, Defendants are unable to point to a single case where a court considered whether oral statements were insufficient to establish explicit waiver.

U.S. at 442–43).  But, as noted above, Plaintiff does not argue that the commercial contract included the relevant waiver of sovereign immunity, they argue that the oral statements of Iraqi officials made after the contract was executed waived sovereign immunity, which courts have found to be allowed under section 1605(a)(1).  *See, e.g.*, *Aquamar*, 179 F.3d at 1283, 1292–1300 (holding that a foreign state explicitly waived its immunity where one of its ambassadors wrote a letter purporting to do so after the complaint was filed); *see also Ashraf-Hassan*, 40 F. Supp. 3d at 100 (noting that the foreign state in that case "may have expressly waived its immunity in its initial pleading").  Further, this is not a case where a foreign state has remained silent on the issue of waiver, as was the case in *Argentine Republic.  See* 488 U.S. at 442–43 (declining to find waiver under 1605(a)(1) based only on various international agreements signed by foreign state prior to enactment of the FSIA that did not mention waiver or immunity); *see also World Wide Minerals*, 296 F.3d at 1162–63 (finding that there was insufficient evidence of explicit waiver in two of the parties' agreements due to the absence of any language indicating waiver, which "create[d] real ambiguity" regarding the foreign state's intent as to those agreements given that the foreign state had included waiver provisions in two other agreements related to the same transaction); *de Sousa v. Embassy of Republic of Angola*, 229 F. Supp. 3d 23, 31 (D.D.C. 2017) (concluding that a choice-of-law provision mandating application of Virginia law "without regard to the jurisdiction in [which] any action . . . may be instituted" was "irrelevant" to the analysis of whether a foreign state had explicitly waived its property immunity).  Rather, here, Plaintiff has provided evidence of statements of senior Iraqi officials asserting that it could sue the foreign state anywhere.

Defendants next argue that even if the FSIA does not require that the waiver be in writing, to be explicit under section 1605(a)(1), an oral waiver must use the words "waiver" or "immunity."  ECF No. 60-1 at 18–20.  To be sure, courts have held that a foreign state explicitly waives

sovereign immunity when it invokes precise language doing so.  *See World Wide Minerals,* 296 F.3d at 1162 & n.13 (finding explicit waiver where the foreign state stated that it "irrevocably agrees not to claim and hereby irrevocably waives . . . immunity for [itself] . . . with the intent . . . that the foregoing waiver of immunity shall have irrevocable effect for the purposes of the [FSIA] in any legal action or proceedings to which such Act applies" (first and fifth alterations in original) (quoting the parties' agreement)); *Libra Bank Ltd. v. Banco Nacional de Costa Rica, S.A.*, 676 F.2d 47, 49–50 (2d Cir. 1982) (finding explicit waiver where a foreign state claimed that one of its entities "can sue and be sued in its own name and does not have any right of immunity from suit with respect to the [entity's] obligations" and that it "irrevocably and unconditionally waives any right or immunity from legal proceedings including suit judgment and execution on grounds of sovereignty which it or its property may now or hereafter enjoy" (quoting parties' agreement)).  But the FSIA does not require magic words like "waiver" or "immunity" to effect explicit waiver; it requires only that such a waiver be "[c]lear, open, direct" and "[e]xpressed without ambiguity or vagueness; leaving no doubt."  *Explicit*, Black's Law Dictionary (11th ed. 2019); *see* 28 U.S.C. § 1605(a)(1).  Courts have rejected the argument that specific words are required to effect waiver.  *See Libra Bank Ltd.*, 676 F.2d at 49 (rejecting argument that explicit waiver requires "recitation of [specific] words" and explaining that the purpose of an explicit waiver requirement "is to preclude inadvertent, implied, or constructive waiver in cases where the intent of the foreign state is equivocal or ambiguous").  Accordingly, the fact that the statements Plaintiff relies on did not include the words "waiver" or "immunity" is not fatal.  Contrary to Defendants' claim that the Iraqi officials' statements "amount to nothing more than an acknowledgment that there was no venue provision" in the Export Commitment Letter, the undersigned finds that those statements—that Defendants *can be sued anywhere*, that Defendants would have *no defense to any such lawsuit*, and

29

that Defendants *would not object to being sued anywhere*—clearly and unambiguously waives Defendants' defense of sovereign immunity from suit anywhere, including in the United States. These statements do not, as Defendants argue, "have to be parsed to try to discern the intention of the speaker." *See* ECF No. 67 at 14.  Instead, the speakers' intentions are clear—Defendants may be sued anywhere, and Iraq would have no defense or objection to such suit, regardless of the country in which suit is brought.

Defendants' third legal argument relies on the decision of a Jordanian appellate court which found that Defendants did not waive immunity from an enforcement proceeding in Jordan seeking to execute the judgment against certain Iraqi property and monies in Jordan.  ECF Nos. 60-1 at 31–33, 60-4 at 6–7; ECF No. 66 at 35–36.  Defendants contend that principles of international comity weigh in favor of this Court deferring to that decision with respect to whether sovereign immunity should be deemed waived here.[10]  Defendants' argument should be rejected for two reasons.  First, the declarations of Ibrahim Al-Qatawneh, on which Defendants rely to provide details about the Jordanian enforcement proceedings, do not comply with 28 U.S.C. § 1746.  Section 1746 is relatively straightforward.  For declarations executed outside of the United States, it requires that they include the following language, or something substantially similar:  "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature)."  28 U.S.C. § 1728.  Both

---

[10] In their motion to dismiss, Defendants also assert that the ruling of the Jordanian court should bar Plaintiff from arguing in this action that there was an explicit waiver of sovereign immunity "[p]ursuant to the doctrines of estoppel or *res judicata* (since the parties are the same)."  ECF No. 60-1 at 32.  Defendants cite nothing to support this throw-away argument that foreign proceedings addressing a different issue should bind either party in this Court.  Accordingly, the undersigned declines to consider it.  *See, e.g.*, *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("Mentioning an argument 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones' is tantamount to failing to raise it." (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005))); *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (finding an argument made in conclusory fashion forfeited).

of Mr. Qatawneh's declarations appear to have been executed outside of the United States,[11] but say only "I hereby declare that this is a true testimony" (ECF No. 60-4 at 2) and "I hereby declare that everything I have stated is true, accurate, consistent with what happened, and factual, in my capacity as an attorney and a person with knowledge thereof, under penalty of liability, if proven otherwise" (ECF No. 67-1 at 4). Neither of these statements conforms to what section 1746 requires as they do not include an oath "under penalty of perjury under the laws of the United States of America," or language substantially similar to that effect. Accordingly, they should be disregarded. *See In re Veiga*, 746 F. Supp. 2d 27, 37 (D.D.C. 2010) (finding that a party could not rely on a declaration that stated "I solemnly declare, on my honor and conscience, that what I have stated is the truth to the best of my knowledge" because it did not substantially comply with section 1746); *Sabra v. Pompeo*, 453 F. Supp. 3d 291, 322 & n.11 (D.D.C. 2020) (finding that a declaration did not meet the section 1746 standard where it stated "[I] declare[ ] under penalty of perjury that the foregoing is true and correct based on [ ] personal knowledge" but did not include language substantially similar to "under the laws of the United States); *In re Korean Air Lines Co. Antitrust Litigation*, Nos. MDL 07-1891, CV 07-5107, 2013 WL 12216516, at *2 (C.D. Cal. Dec. 6, 2013) (striking declarations executed outside of the United States that did not "include[ ] any language specifying the country [they] [were] executed in or the laws under which [they] [were] executed" and thus failed to comply with section 1746).

Second, even if the Court were to consider Defendants' declarations, nothing they contain concerning the proceedings in Jordan is persuasive on the waiver issue before this Court. That a

---

[11] Mr. Qatawneh's declaration filed with Defendants' motion to dismiss includes "Amman/Jordan" after the date and above his signature. ECF No. 60-4 at 2. Mr. Qatawneh's reply declaration does not state where it was executed, but it is written on his firm's letterhead which identifies the locations of Mr. Qatawneh's office as in Amman. ECF No. 67-1 at 2–4. Further, Defendants do not contend it was executed in the United States. *See* ECF No. 69 at 6 (arguing only that the declaration includes language substantially similar to section 1746).

Jordanian court found that Defendants did not waive sovereign immunity as to an enforcement action seeking to attach Iraqi property and monies in Jordan does not mean that the same conclusion is warranted here where Plaintiff seeks recognition of a foreign judgment pursuant to the FSIA.  Indeed, as Defendants themselves explained in their first motion to dismiss, "the question whether '. . . there ha[s] been a waiver of sovereign immunity in [the foreign tribunal] [is] different from 'the question before *this* Court [which] is the extent of its own jurisdiction to entertain [the plaintiff's] action under federal law, and the Court has a duty to make its own independent factual determinations in order to ascertain its authority under the FSIA.'"  ECF No. 28-1 at 24 (fifth alteration in original) (quoting *SACE*, 243 F. Supp. 3d at 43).  Agreed.  As the court observed in *SACE*, "[a]lthough there [may be] no dispute that [foreign courts] are competent to adjudicate the issues before them and are thus entitled to respect," that decision should not control whether *this* Court has subject-matter jurisdiction over Defendants under the FSIA.  *SACE*, 243 F. Supp. 3d at 43.

Defendants' final legal challenge is that even if the Court were to find that Defendants explicitly waived sovereign immunity with respect to the Export Commitment Letter, an additional waiver of immunity is necessary because Plaintiff now seeks to enforce a judgment, rather than the Letter, against Defendants.  ECF No. 67 at 15 & n.5.  Defendants' argument on this point evolved between its motion to dismiss and it reply in further support of that motion; however, both versions of the argument fail.  First, Defendants suggest in their motion to dismiss that the statements on which Plaintiff relies should be narrowly construed to apply only as a waiver of immunity from suit seeking to enforce the Export Commitment Letter.  ECF No. 60-1 at 33.  But the statements made by the Iraqi officials more broadly waive sovereign immunity with respect to suits seeking to enforce Plaintiff's rights under the Letter (*see* ECF No. 24-6, ¶ 7) and suits seeking to

collect the debt owed to Plaintiff under the Letter (*id.*, ¶ 11). The Jordanian judgment is a court order enforcing Plaintiff's rights under the Letter and setting the monetary amount owed to Plaintiff under the Letter. Thus, proceedings seeking recognition of that judgment are fairly considered suits seeking to enforce Plaintiff's rights under the Letter and collect the debt owed to Plaintiff under the Letter; that is, the proceedings for which Defendants explicitly waived sovereign immunity. *See, e.g.*, *Comm'ns Import Export S.A. v. Republic of the Congo*, 757 F.3d 321, 324–25 (D.C. Cir. 2014) (noting that the court had jurisdiction over an action seeking recognition of a foreign judgment where the foreign state waived sovereign immunity from legal proceedings related to the parties' contract upon which the foreign judgment was based); *Nat'l Union Fire Ins. Co. v. People's Republic of the Congo*, 729 F. Supp. 936, 940 (S.D.N.Y. 1989) (same); *cf. Cont'l Transfer Tech. Ltd. v. Fed. Gov't of Nigeria*, 697 F. Supp. 2d 46, 56 (D.D.C. 2010) (finding that court had subject matter jurisdiction over suit for confirmation of a foreign arbitral award *and* for recognition of a foreign judgment enforcing the arbitral award pursuant to the FSIA's jurisdictional immunity exception for actions brought to confirm an arbitral award).

In their reply brief, Defendants switch gears and argue that Plaintiff must show that Defendants waived sovereign immunity under section 1610 of the FSIA. ECF No. 67 at 15–17 & n.5. In support, Defendants point to the Restatement (Fourth) of the Foreign Relations Law of the United States § 453(4), which states that "[a] waiver of immunity from the jurisdiction of a court . . . to adjudicate a dispute does not constitute a waiver of immunity with respect to enforcement of the resulting judgment against the foreign state" and point to sections 1605(a)(1) and 1610(a)(1) of the FSIA, which Defendants' explain draw a distinction between jurisdictional immunity and "execution" immunity,[12] respectively. *Id.* at 15 & n.5. Defendants misunderstand the two types

---

[12] Defendants refer to "execution" immunity in their argument and cite section 1610 of the FSIA. ECF No. 67 at n.5. Section 1610 governs "exceptions to immunity from attachment or execution," which courts generally refer to as

of immunity granted by the FSIA.  The Supreme Court explained in *Rubin v. Islamic Republic of Iran*, that the FSIA grants foreign states two types of immunity:  (1) a foreign state has "immunity from suit in the United States (called jurisdictional immunity)" and (2) a foreign states' *property* has "immunity *from attachment and execution* in satisfaction of judgments against [a foreign state]." __ U.S. __, __, 138 S. Ct. 816, 820 (2018) (emphasis added); *see* 28 U.S.C. §§ 1604 (governing jurisdictional immunity), 1609 (governing property immunity).  So, section 1609 governs the "[i]mmunity . . . *of property* of a foreign state," *Rubin*, __ U.S. at __, 138 S. Ct. at 824, and provides that "*the property* in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611,"  28 U.S.C. § 1609.  Sections 1610 and 1611 provide certain exceptions to section 1609, where property will not be immune from attachment.  *See id.* §§ 1610–1611.  The Restatement section that Defendants cite merely explains this distinction between jurisdictional and property immunity.  *See* Restatement (Fourth) of Foreign Relations Law § 453, reporter's noteote 12 (Am. Law. Inst. 2018) (explaining that subsection (4) was added "to clarify the distinction between waivers of immunity from jurisdiction and waivers of immunity from execution); *id.*, cmt. d (explaining that "[w]aivers of immunity from *adjudicative* jurisdiction are distinct from waivers of immunity from *attachment and execution*.  A waiver of immunity from suit is not itself a waiver of immunity from attachment or execution" (emphasis added); *compare, e.g.*, 28 U.S.C. § 1605(a)(6) (governing exception to jurisdictional immunity in proceedings "to confirm an [arbitral] award"), *with* 28 U.S.C. § 1610(a)(6) (governing exception to property immunity in proceedings seeking "attachment in aid of execution . . . [of] an order confirming an arbitral award).

---

"property immunity."  *See Rubin*, 138 S. Ct. at 820. To limit confusion, the undersigned will refer to this immunity as property immunity.

Where, as here, Plaintiff does not seek to attach Defendants' property in the United States—or at least not yet—sections 1609 through 1611 of the FSIA are not operative; there is no reason that Plaintiff must show that Defendants have waived property immunity where Defendants' property is not implicated. *See, e.g.*, *Rubin*, __ U.S. at __, 138 S. Ct. at 821 (considering whether one of the exceptions to property immunity provided by section 1610 applied in case where "petitioners brought [an] action . . . to attach and execute against certain Iranian assets located in the United States in satisfaction of their judgment [against Iran]"); *Cont'l Transfert Tech., Ltd. v. Fed. Gov't of Nigeria*, No. 08-2026, 2019 WL 3562069 (D.D.C. Aug. 6, 2019) (considering whether an exception to property immunity under section 1610 applied where plaintiff filed a motion for a writ of attachment seeking to attach a bank account registered to the Central Bank of Nigeria); *Hercaire Int'l, Inc. v. Argentina*, 821 F.2d 559, 561, 563 (11th Cir. 1987) (considering exceptions to property immunity under section 1610 in appeal from district court order permitting the plaintiff to seize property owned by Argentinian airline in satisfaction of a judgment against Argentina); *Walker Int'l Holdings, Ltd. v. Republic of Congo*, 395 F.3d 229, 232–38 (5th Cir. 2004) (considering exceptions to property immunity under section 1610 in garnishment action). Notably, the Jordanian proceedings that Defendants point to in order to show an appellate court in Jordan concluded that Defendants had not waived sovereign immunity involved a suit seeking to attach Iraqi property located in Jordan. ECF No. 60-4 at 6–7 (explaining that court order appealed by Defendants in Jordan authorized seizure of Iraqi property and monies located in Jordan). So, it is sufficient for this case that Plaintiff has alleged that Defendants waived immunity to suit with respect to the Export Commitment Letter.

Accordingly, the undersigned finds that Defendants have not met their burden of persuasion by showing that Plaintiff's allegations, accepted as true, fail to provide a legally sufficient basis for finding explicit waiver of sovereign immunity.[13]

2.      Commercial Activities Exception

In the event this Court finds that Defendants have not explicitly waived their sovereign immunity, the undersigned will also address the parties' arguments regarding the FSIA's commercial activities exception.  Under that exception, even if a foreign state has not waived its immunity, a district court has subject-matter jurisdiction over any lawsuit

> based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).  Only the third clause of this exception—when the lawsuit is "based upon . . . an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States," *id.*—is at issue here.  ECF No. 66 at 38.

Defendants argue that because Plaintiff's lawsuit is "based upon" only the Jordanian judgment, which is not a commercial activity, section 1605(a)(2) is inapplicable.  ECF No. 60-1 at 34. Plaintiff does not dispute that the Jordanian judgment is not an act to which section 1605(a)(2) applies.  *See* ECF No. 66 at 38–40.  Instead, Plaintiff contends that its lawsuit is "based upon" Defendants' failure to ship the product under the agreement, which constitutes a commercial act

---

[13] Defendants, however, should be permitted to raise the issue of explicit waiver again in future pretrial proceedings when the record is more developed because, when faced with a foreign state's invocation of immunity, "more than the usual is required of trial courts in making pretrial factual and legal determinations.  In such circumstances, it is particularly important that the court 'satisfy itself of its authority to hear the case' *before* trial.'"  *Foremost-McKesson, Inc. v. Islamic Rep. of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990) (internal citation omitted) (quoting *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179 (D.C. Cir. 1984)).

for purposes of section 1605(a)(2).  *See id.*  Resolving this issue thus requires deciding whether, under the third clause of section 1605(a)(2), a lawsuit to recognize a foreign judgment is "based upon" only the judgment or also upon a foreign state's commercial conduct from which the judgment arises.  Notably, the undersigned's previous Report and Recommendation addressed this very same argument and the parties have presented nothing new in their second round of briefing that would warrant a different result.

The Supreme Court has stated that, for purposes of the first clause of the commercial activities exception, which is not at issue here, a lawsuit is "'based upon' . . . those elements of a claim that, if proven, would entitle a plaintiff to relief under [its] theory of the case."  *Nelson*, 507 U.S. at 357; *see also OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015) (affirming *Nelson*'s definition of "based upon" for purposes of the first clause).  The D.C. Circuit has extended *Nelson's* definition to the second clause of section 1605(a)(2)—which is also not at issue here— noting that the "virtually identical statutory text and structure of clauses one and two lead us to conclude that 'based upon' means the same thing in both clauses."  *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 37 (D.C. Cir. 2014).  Thus, the court held that "a suit against a foreign sovereign may proceed under clause two only if the 'act performed in the United States in connection with a commercial activity of the foreign state elsewhere' establishes a fact without which the plaintiff will lose."  *Id.* at 38 (quoting 28 U.S.C. § 1605(a)(2)) (citing *Nelson*, 507 U.S. at 357).  For the third clause, however, neither the Supreme Court nor the D.C. Circuit has articulated a definition of "based upon."

Perhaps as a result of this gap, courts are split on whether, for purposes of the third clause, an action to enforce a foreign judgment is "based upon" only the judgment or also upon a foreign state's commercial conduct from which the judgment arises.  On the one hand, the Second Circuit,

relying on a panel decision predating *Nelson*, has held that courts should "look at the conduct underlying the . . . judgment[ ]." *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 389 (2d Cir. 2000) (citing *Int'l Hous. Ltd. v. Rafidain Bank Iraq*, 893 F.2d 8, 11–12 (2d Cir. 1989)).  On the other hand, this Court recently extended *Nelson* to the third clause of section 1605(a)(2) and held that such an action is "based upon" only the judgment, not a foreign state's commercial conduct giving rise to the judgment.  *Valambhia v. United Rep. of Tanzania*, No. 18-cv-370, 2019 WL 1440198, at *3–4 (D.D.C. Mar. 31, 2019), *aff'd*, 964 F.3d 1135 (D.C. Cir. 2020), *cert. denied*, __ S. Ct. __, 2021 WL 1520802 (2021).  The *Valambhia* Court reasoned that the elements of a foreign-judgment recognition claim are as follows:  (1) the foreign court had personal and subject-matter jurisdiction over the action; (2) the foreign court had due process safe- guards; and (3) the foreign court issued an enforceable final judgment.  *Id.* at *3 (citing D.C. Code §§ 15-363(a), 15-364(b)).  Thus, the Court held that, because the "underlying commercial conduct . . . is not an 'element[ ] of a claim' for recognition of a foreign judgment or 'a fact without which the plaintiff will lose,'" the commercial activities exception is inapplicable to such a claim.  *Va- lambhia*, 2019 WL 1440198, at *3–4 (second alteration in original) (citations omitted) (first quot- ing *Nelson*, 507 U.S. at 357, then quoting *Odhiambo*, 764 F.3d at 38).  The Court acknowledged that its holding "effectively makes dead letter of an action to recognize a foreign court judgment brought against a foreign sovereign under the commercial activities exception" because a court judgment would never be deemed an act taken in connection with commercial activity under the third clause of section 1605(a)(2), but it maintained that "a faithful interpretation of *Odhiambo* and *Nelson*" necessitated this outcome.  *Valambhia*, 2019 WL 1440198, at *4.[14]   On appeal, the D.C.

---

[14] The Court also noted that, in *Transatlantic Shiffahrtskontor*, the Second Circuit called into question its approach as being "in some tension with a literal reading of the definition of 'based upon' used by the Supreme Court in *Nelson*." *Valambhia*, 2019 WL 1440198, at *4 (quoting *Transatlantic Shiffahrtskontor*, 204 F.3d at 389 n.4).

Circuit affirmed the Court's decision; however, it did so on other grounds, concluding that the "direct effects" alleged by the plaintiff were too distant because they involved a single payment into a United States bank account in the 1980s and the mere fact that the plaintiffs were United States citizens and resided in the United States. *Valahmbhia v. Tanzania*, 964 F.3d at 1140–43. Considering Judge Chutkan's broader holding, the Circuit concluded that "[it] need not decide whether, as a categorical matter, '*any* suit brought on a foreign judgment—rather than on the conduct that underlies that judgment—is too distant' to satisfy this [commercial activity] exception." *Id.* at 1144 (quoting *Transatlantic*, 204 F.3d at 390).

Nevertheless*,* Judge Chutkan's reasoning in *Valambhia* is persuasive, and this Court should find that, for purposes of all three clauses of the commercial activities exception, an action to enforce a foreign judgment is "based upon" only the judgment, not a foreign state's commercial conduct giving rise to the judgment.  Importantly, all three clauses of this exception have "virtually identical statutory text and structure." *Odhiambo*, 764 F.3d at 37; *see* 28 U.S.C. § 1605(a)(2). And "there is a presumption that a given term is used to mean the same thing throughout a statute, a presumption surely at its most vigorous when a term is repeated within a given sentence." *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 456 (2012) (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994)).  Thus, the *Nelson* definition should be deemed to apply to the third clause of section 1605(a)(2) as well.  The Supreme Court clarified in that case that a lawsuit is "'based upon' . . . those elements of a claim that, if proven, would entitle a plaintiff to relief under [its] theory of the case." *Nelson*, 507 U.S. at 357.  Because the elements of a foreign-judgment recognition claim relate only to the judgment and not a foreign state's commercial conduct, such a lawsuit, for purposes of the commercial activity exception, is "based upon" only the judgment.  *See* D.C. Code

§§ 15-363(a), 15-364(b); *cf. Valambhia*, 2019 WL 1440198, at *3–4.  Thus, the commercial activities exception is inapplicable here.[15]

Alternatively, if this Court were to find that application of the commercial activities exception requires inquiring into Defendants' commercial conduct giving rise to the Jordanian judgment, then there would be an "act taken in connection with [Defendants'] commercial activity"—namely, Defendants' failure to ship the product.  28 U.S.C. § 1605(a)(2).  This Court would then have to determine whether Defendants' actions had a "direct effect" in the United States.  *Id.*  For the reasons explained below, Plaintiff's allegations sufficiently establish a direct effect such that the commercial activities exception would apply.  As with the "based upon" discussion above, the parties' arguments regarding "direct effects" have not substantially changed in this second round of briefing; so, much of the following analysis remains the same from the undersigned's January 2020 Report and Recommendation.

The D.C. Circuit's cases "draw a very clear line: For purposes of clause three of the FSIA commercial activity exception, breaching a contract that establishes or necessarily contemplates the United States as a place of performance causes a direct effect in the United States, while breaching a contract that does not establish or necessarily contemplate the United States as a place of performance does not cause a direct effect in the United States."  *Odhiambo*, 764 F.3d at 40.  Accordingly, courts have found direct effect where the parties knew at the time of contracting that at least some contractual performance would occur in the United States.  For example, in *de Csepel*

---

[15] Plaintiff argues that this interpretation of the commercial activities exception "would render the third clause of the FSIA meaningless and the outcome, absurd."  ECF No. 66 at 40.  Hardly. For Plaintiff's concern to be warranted, the commercial activity exception would have to  be applicable only to suits for recognition of foreign money judgments, which is not the case.  So, even if, as Judge Chutkan recognized, the *Valambhia* decision "effectively makes dead letter of an action to recognize a foreign court judgment . . . under the commercial activities exception" the exception will hardly be "rendered meaningless" given that it is still applicable to any other lawsuit where the claim is based upon a foreign state's commercial activities conducted outside of the United States, but which have a direct effect in the United States.

*v. Republic of Hungary*, the D.C. Circuit held that, where the plaintiffs alleged that the defendant breached a promise to return artwork to a family it knew to be residing in the United States at the time of contracting, the plaintiffs had provided sufficient evidence of direct effect to survive a motion to dismiss. 714 F.3d at 600–01. Similarly, in *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Canada*, the D.C. Circuit determined that the plaintiff had alleged enough facts to withstand a motion to dismiss where the agreement in question obligated the plaintiff to subcontract with U.S.-based companies, and the defendant breached the agreement while the plaintiff was negotiating with those companies. 600 F.3d 661, 662, 663–66 (D.C. Cir. 2010). The court further held that "[n]othing in the FSIA requires that the 'direct effect in the United States' harm the plaintiff." *Id.* at 666 (quoting 28 U.S.C. § 1605(a)(2)).

By contrast, the D.C. Circuit and this Court have found no direct effect where at least one of the parties was not aware at the time of contracting that any contractual performance would occur in the United States. For example, in *Odhiambo*, the D.C. Circuit found no direct effect where a foreign state failed to pay the plaintiff a promised reward in the United States because the plaintiff moved to the United States after accepting the offer, which was not contemplated at the time of acceptance. 764 F.3d at 33, 40–41. Similarly, in *Agrocomplect, AD v. Republic of Iraq*, this Court held that there was no direct effect because "[t]he decision to use American sub-contractors and American supplies was the plaintiff's decision, and the plaintiff [did] not allege that its decision was mandated by the Contract or expected based on the customary practices of the parties." 524 F. Supp. 2d 16, 32 (D.D.C. 2007).

Here, Plaintiff has alleged sufficient facts showing that the parties contemplated performance in the United States when they entered into the agreement and has thus met its initial burden of production. According to Plaintiff, under the agreement, Defendants would settle their debt by

shipping the product so that Plaintiff could sell it to a U.S. buyer. *See* ECF No. 24-3 at 2–3, ¶ 5 ("Iraq would export 450,000 tons of sulfur and 100,000 tons of urea . . . , which would then be transited through the port of Aqaba, Jordan to a United States buyer, the purchase proceeds of which would belong to [Plaintiff] to satisfy the Commercial Debt . . . ."); ECF No. 24-4 at 2–3, ¶ 5 (same). Plaintiff's alleged actions shortly after entering into the agreement corroborate its claim that the sale to a U.S. buyer was an essential component of the settlement: Abdel Nassif, then the Commercial Manager of Plaintiff, contacted the U.S. Embassy in Jordan and informed it of the agreement in order to obtain a list of potential U.S. buyers, and after the Embassy provided him such a list, he identified a New York company that offered the "best price" for the product. ECF No. 24-4 at 2, ¶ 3; *id.* at 3, ¶¶ 7–11. Pursuant to its negotiations with that company, Plaintiff, through Abdel Nassif, arranged for insurance, inspection services, letters of credit, and other requirements to prepare the product's shipment to the United States. *Id.* at 3–4, ¶¶ 11–15; *see* ECF No. 24-5 at 3–4, ¶¶ 7–15. When Defendants failed to ship the product, Plaintiff's deal with the New York company collapsed. ECF No. 24-4 at 4, ¶¶ 16–17; ECF No. 24-5 at 4, ¶¶ 16–18. Moreover, Plaintiff claims that Defendants knew at the time of contracting that Plaintiff would ship the product to a U.S buyer and that the only way Defendants' debt would be satisfied was through such a sale in the United States. ECF No. 66 at 41. Accordingly, because Defendants "terminated the contract," performance that was contemplated in the United States and otherwise would have been rendered there "was not forthcoming," and thus Defendants' commercial activities had a direct effect in the United States. *Cruise Connections*, 600 F.3d at 665 (quoting *Republic of Argentina v. Weltover*, 504 U.S. 607, 619 (1992)).

The burden then shifts to Defendants to rebut Plaintiff's allegations by a preponderance of the evidence and show that there was no direct effect on the United States. *Agudas Chasidei*, 528

F.3d at 940.  With respect to Plaintiff's factual allegations, Defendants do not dispute that they knew at the time of contracting that Plaintiff would ship the product to a U.S buyer, that the only way Defendants' debt would be satisfied was through such a sale, or that, soon after entering into the agreement, Plaintiff reached a deal with a New York company to sell the expected product—allegations that satisfy Plaintiff's burden of production to show that the agreement contemplated performance in the United States. *See* ECF No. 60-1 at 39–41; ECF No. 67 at 25–27.  Rather, Defendants' factual challenge is that "there is nothing in the record to support that Plaintiff's intended sale to the U.S. buyer was actually to result in delivery "in the United States" and that "Plaintiff alleges no more than that a U.S. company or U.S. citizen is the party being directly affected."  ECF No. 67 at 27.  Not so.  Plaintiff's declaration states in multiple places that the product would be shipped to New York.  ECF No. 24-4 ¶ 10 (when Plaintiff sought bids from various United States companies, he stated that "the Product would be delivered *to any U.S. port*"); ¶ 14 (explaining that "the [p]roduct . . . would transit through Aqaba *to New York*); ¶ 15 (discussing transit of the product from Aqaba *to New York*).  Defendants have therefore failed to rebut the factual allegations in Plaintiff's complaint by a preponderance of the evidence.

Defendants also raise legal challenges to argue that the Plaintiff's allegations, accepted as true, cannot provide a basis for jurisdiction under the commercial activities exception.  Defendants argue that in order to find a direct effect in the United States, the "[p]erformance due in the United States must be the contractual performance *of the foreign state*[,]" not the plaintiff.  ECF No. 60-1 at 35–36 (emphasis added).  Thus, "[t]he question is not whether the parties generally envisioned that one of them may resell the Materials in the United States—it is what [ ] the foreign state [was] contractually obligated to do[.]"[16]  ECF No. 60-1 at 39–40. Defendants further argue that, to

---

[16] Defendants also suggest that because the Jordanian judgment concluded that the contract required Defendants to perform in Jordan, then comity and *res judicata* require this Court to find the same.  ECF No. 67 at 26.  This argument

constitute an effective waiver of sovereign immunity under the commercial activities exception,

the Export Commitment Letter had to designate the United States as the place of performance.

ECF No. 60-1 at 36–38.  In making these arguments, Defendants misinterpret this Circuit's cases

applying the commercial activities exception.

First, Defendants' contention that the foreign state must be the entity obligated to perform

in the United States for its acts or omissions to constitute a "direct effect" is incorrect.  *See* ECF

No. 60-1 at 35.  No case Defendants cite suggests such a restrictive definition of "direct effect."

Defendants point to *Weltover* to support their argument, but the fact that the action in the United

States in that case was a contractual obligation of the foreign state was sufficient, but not required,

for satisfying the commercial activities exception.  *See generally Weltover*, 504 U.S. at 618–19.

Rather, in *Cruise Connections*, the D.C. Circuit explained that "[t]he FSIA . . . requires only that

[the] effect be 'direct,' not that the foreign sovereign agree that the effect would occur,"[17] 600 F.3d

at 665, and in *Valahmbia*, the Circuit explained that "direct effect" means one that "follows as an

immediate consequence of the defendant's activity."  964 F.3d at 1140 (quoting *Weltover*, 504

U.S. at 618).  Neither case stands for the proposition that the foreign state must be the entity obli-

gated to perform in the United States.  The D.C. Circuit's decision in *EIG Energy Fund XIV v.*

*Petroleo Brasileiro*, 894 F.3d 339 (D.C. Cir. 2018) is instructive on this issue.  In that case,

---

is irrelevant.  As discussed above, it does not matter what Defendant was contractually obligated to do because, ulti-
mately, the parties' contract necessarily contemplated performance in the United States. That is all that the commercial
activity exception requires.  A holding here that Defendants' breach had a direct effect on the United States does not
disrespect or contradict the decision of the Jordanian court.

[17] Defendant suggests that *Cruise Connections* is distinguishable because the Court "relied on" the fact that "the [for-
eign state defendant] contracted with a U.S. citizen, . . . the contract [ ] required the cruise ships . . . to come from
specific [U.S.-based] cruise lines . . . and all efforts to negotiate the charter party agreements occurred in the United
States" to conclude that the breach of contract in that case had a direct effect on the United States.  ECF No. 60-1 at
42–43.  But the Circuit listed those factors when it distinguished the case from one where it found no direct effect. *Id.*
at 665.  The Circuit did not, as Defendants suggest, find that those factors were required in every case in order to find
a direct effect.

Petrobras, a state-owned oil company in Brazil, discovered significant amounts of underseas oil off the coast of Brazil and formed a foreign-investment venture, called Sete Brasil Participações, S.A. (to simplify, "Sete"), to extract the oil deposits.  *Id.* at 342.  In an effort to finance its venture, Petrobras, through Sete, targeted U.S. investors, including the plaintiff in the case, EIG Energy. *Id.*  EIG Energy invested over $200 million in the project.  *Id.*  Subsequently, a corruption and fraud investigation involving Petrobras came to light, causing "skittish lenders" to withdraw their support from the project, and making it impossible for the project to proceed.  *Id.* at 343.  As a result, EIG was left with worthless shares when Sete declared bankruptcy.  *Id.*  EIG Energy sued, arguing in relevant part, that the commercial activities exception provided a basis for the district court's subject-matter jurisdiction over state-owned Petrobras.  *Id.*  The D.C. Circuit agreed.  First, the Circuit found that "EIG [had] made a *prima facie* case for jurisdiction" where "[Petrobras's] misrepresentations about [the ongoing fraud at Petrobras and at Sete] cause[d] [a] direct effect in [the] United States [because] [Petrobras] 'contemplated investment by United States persons' and 'at lease some investors . . . suffered an economic loss in [the United States] as a result of those misrepresentations.'"  *Id.* at 345 (ellipses in original) (quoting *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 110 (2d Cir. 2016)).  So, "[t]he burden [shifted to] Petrobras to establish an affirmative defense to jurisdiction."  *Id.*  Petrobras argued that their misrepresentations did not cause EIG Energy's injury because an intervening event—"third-party lenders' decision not to lend to Sete—'broke the chain of causation'" and thus EIG Energy's injury was not a *direct* effect of Petrobras's alleged fraud.  *Id.* at 345 (quoting appellant's brief). The D.C. Circuit rejected that argument, concluding that it "effectively propose[d] a highly restrictive causation requirement under which contributing factors readily and predictably caused by [Petrobras's] same act would preclude jurisdiction."  *Id.* at 346.  The Circuit explained that "the

lenders withdrew *for the same reason* that EIG's investment became worthless: Petrobras's alleged fraud. . . .  The lenders' withdrawal and EIG's tanking investment are, in other words, two 'effects' with the same cause."  *Id.* at 346.

So too here.  Plaintiff's inability to deliver the product to the U.S. buyer, and the effect on the U.S.—that is, the U.S. buyer not receiving the product in New York—are two effects with the same cause, Defendants' failure to ship the product.  Defendants suggest that this interpretation "would turn the FSIA jurisprudence on its head if a plaintiff could draw a foreign state into U.S. courts by the *plaintiff's* actions, as opposed to the actions *of the foreign state*."  ECF No. 60-1 at 40.  But that is not the case here.  Plaintiff's breach of contract claim centered on the *actions of the foreign state*—Defendants' failure to ship the product—not the actions of Plaintiff.  To be sure, if Defendants had shipped the product and, subsequently, Plaintiff had failed to deliver the product to the U.S. buyer, then Defendants may well have an argument that Plaintiff's failure to ship was an intervening action that "broke the chain of causation," but Defendants have not pointed to any such intervening action or failure by Plaintiff.  Put simply, because Defendants failed to ship the urea and sulfur, materials that would otherwise have been delivered to the United States were "not forthcoming."  *Cruise Connections*, 600 F.3d at 665.

Defendants' also point to a line of cases in this Circuit to argue that the contract must designate the United States as "the place of performance."  ECF No. 60-1 at 36–38.  But the cases Defendants cite—*Peterson v. Royal Kingdom of Saudi Arabia*, *Friedman v. UAE*, *Goodman Holdings v. Rafidain Bank*, and *Odhiambo*—are "pay wherever you are" cases and their findings of "no direct effect" are premised on the fact that the contracts at issue could have been enforced anywhere in the world because they involved the payment of money to the plaintiff.  *See Peterson*, 416 F.3d 83, 90–91 (D.C. Cir. 2005) (concluding that "pay-wherever-you-are" agreements could

not have a direct effect on the United States because of the plaintiff's ability to move and receive payment at the location of his choice); *Friedman*, 464 F. Supp. 3d 52, 63–67 (D.D.C. 2020) (concluding that breach of "pay wherever you are" promissory note did not constitute a direct effect on United States simply because the plaintiff happened to reside in United States when he sought to enforce the note); *Goodman Holdings*, 26 F.3d 1143, 1146–47 (D.C. Cir. 1994) (finding no direct effect where foreign sovereign "might well have paid" the plaintiff through funds located in the United States, but "might just as well have done so" from funds outside of the United States); *Odhiambo*, 764 F.3d at 39–40 (D.C. Cir. 2014) (finding that "pay wherever you are" arrangements have been "repeatedly" found to be "insufficient to cause a direct effect in the United States").

In contrast, where the Circuit has considered contracts requiring delivery of a product—artwork, for example—it has found it sufficient that the foreign state understood that the recipient was located in the United States and thus performance was *necessarily contemplated* in the United States. *See de Csepel*, 714 F.3d at 600 ("Although the complaint never expressly alleges that the return of the artwork was to occur in the United States, we think this is fairly inferred from the complaint's allegations that the bailment contract required . . . return of the property itself . . . to members of the Herzog family Hungary knew to be residing in the United States."); *Valahmbhia*, 964 F.3d at 1143 (distinguishing between *de Csepel*, which involved specific performance, and the "pay wherever you are case" before that court, which involved payment of money into a bank account, whether that account was "in Tanzania, Ireland, . . . the United States, or [ ] anywhere else in the world"). Here, the parties' commercial contract involved delivery of goods—urea and sulfur—to a buyer located in the United States. Defendants have not provided any evidence or argument to suggest that it would have been feasible to ship the goods anywhere in the world, depending on where the buyer happened to be at any given time. Thus, this case is more like *de*

*Csepel* where the foreign state was obligated to ship artwork to an individual located in the United States, than *Peterson*, *Friedman*, *Goodman*, or *Odhiambo* where the "performance"—payment of money—was not specifically designated to occur in the United States and could occur anywhere in the world.

In sum, if this Court finds that Defendants have not explicitly waived their sovereign immunity, it should grant Defendants' Rule 12(b)(1) motion because the commercial activities exception is inapplicable, as Plaintiff's lawsuit is "based upon" only the Jordanian judgment, which is not a commercial activity.  If, however, this Court finds that Defendants have not explicitly waived their immunity and that Plaintiff's lawsuit is "based upon" Defendants' commercial conduct, it should deny Defendants' Rule 12(b)(1) motion because Defendants' conduct had a direct effect in the United States, and the commercial activities exception therefore applies.

> 3.    Violation of United States Sanctions Against Iraq

Defendants last argument with respect to sovereign immunity is that there can be neither explicit waiver of sovereign immunity, nor jurisdiction under the commercial activities exception, based on the parties' contract because that contract violated the United States sanctions against Iraq that were in place at the time the parties entered the agreement. ECF No. 60-1 at 43–44. Defendants argue that because the agreement was purportedly illegal under United States law it cannot provide a legal basis for explicit waiver of sovereign immunity, nor could their failure to ship the product have had a legally cognizable direct effect in the United States. *See id.*  Plaintiff responds by noting that Defendants have provided no evidence that the contract violated the sanctions regime, particularly given the fact that Plaintiff alleges that it informed the United States Embassy of the agreement and was referred to the United States buyer through the embassy. ECF No. 66 at 49–52.  Plaintiff is correct.  As Defendants recognize, an entity could engage in an activity otherwise prohibited by the sanctions by "obtain[ing] a license (permission) from [the

48

Office of Foreign Assets Control]," known as "OFAC."  ECF No. 60-1 at 46.  So, Defendants recognize that certain conduct that may otherwise have violated the sanctions could have been authorized by OFAC. Yet, Defendants have not provided any evidence to support their argument that the contract here did in fact violate the sanctions regime by, for example, showing that it would have been ineligible for an OFAC license or that Plaintiff had previously been denied an OFAC license for the transaction in question.  *See generally* ECF No. 60-1 at 43–44.  Without more, Defendants' argument fails.

### B.   Dismissal Under Rule 12(b)(6)

Defendants also seek dismissal for failure to state a claim under the D.C. Recognition Act because Plaintiff has failed to allege in the Complaint that recognizing the Jordanian judgment would not violate United States and D.C. public policy.  *See* ECF No. 60-1 at 44–49.  In support of this contention, Defendants argue that the parties' agreement constituted an attempt to evade U.S. sanctions prohibiting the importation of goods of Iraqi origin into the United States, and that recognizing the Jordanian judgment, which is based on that agreement, would therefore be repugnant to U.S. and D.C. public policy.  *See id.* at 48–49.  That argument, however, is unavailing on a Rule 12(b)(6) motion.

To state a claim under the D.C. Recognition Act, the party seeking recognition of a foreign judgment must demonstrate that the judgment authorized or denied monetary payment and that the judgment was final, conclusive, and enforceable under the law of the nation that issued it.  D.C. Code § 15-363(a), (c).  The defendant then bears the burden of establishing the affirmative defense of repugnancy to public policy.  *See Comm'ns Import Export, S.A. v. Rep. of Congo*, 118 F. Supp. 3d 220, 225–26, 228 (D.D.C. 2015).  Here, Defendants do not dispute that the Jordanian judgment authorized monetary payment or that it was final, conclusive, and enforceable under Jordanian

49

law.  *See* ECF No. 60-1 at 44–49.  Rather, Defendants argue that Plaintiff has failed to allege that the contract did not violate the United States sanctions against Iraq.  *See id.* at 46–47.  This argument, however, provides no basis for dismissal under Rule 12(b)(6) because Plaintiff is "not required to anticipatorily negate" the affirmative defense of repugnancy to public policy.  *McNamara*, 866 F. Supp. 2d at 17; *see Chem-Met Co.*, 1997 WL 74541, at *2.

Defendants contend that because their repugnancy argument is a statutory exception and appears on the face of Plaintiff's pleading—that is, because Plaintiff admits that the product was intended for delivery to the United States—the issue may be resolved with a 12(b)(6) motion.  ECF No. 67 at 29.  But even if that were the case, as noted above in Part II.A.3, Defendants have not provided any evidence to allow the undersigned to determine from the instant record whether the parties' contract violated the sanctions regime.  Defendants confusingly claim on reply that getting an OFAC license would not "solve[ ] the underlying issue that if Plaintiff were to sell the Iraqi goods to a U.S. buyer, *through legal means* or otherwise, the underlying transaction would violate the U.S. Sanctions regime."  *Id*. (emphasis added).  Yet, Defendants provide nothing to support this argument that a legal transaction, authorized by an OFAC license, would still violate the sanctions regime and be repugnant to public policy.  Accordingly, even if the Court were to consider Defendants' repugnancy argument at this stage, Defendants' have failed to show at this stage that the parties' agreement violated U.S. or D.C. public policy.[18]

This Court should deny Defendants' Rule 12(b)(6) motion.

---

[18] Defendants' public policy arguments are best addressed on a motion for summary judgment after further briefing and development of the record.  *Cf. Soc'y of Lloyd's v. Siemon-Netto*, 457 F.3d 94, 99 (D.C. Cir. 2006) (considering public policy arguments in a foreign-judgment recognition claim on a motion for summary judgment as opposed to a Rule 12(b)(6) motion); *Comm'ns Import Export*, 118 F. Supp. 3d at 222, 228–30 (same); *LG Display Co. v. Obayashi Seikou Co.*, 919 F. Supp. 2d 17, 20, 31–32 (D.D.C. 2013) (same), *aff'd*, 615 F. App'x 954 (Fed. Cir. 2015); *Matusevich v. Telnikoff*, 877 F. Supp. 1, 2–4 (D.D.C. 1995) (same), *aff'd*, 159 F.3d 636, 1998 WL 388800 (D.C. Cir. May 5, 1998).

### C.      Dismissal on *Forum Non Conveniens* Grounds

Defendants' final argument is that the case should be dismissed on *forum non conveniens* grounds because Jordan is the most appropriate forum to litigate this action and the private and public interest factors favor dismissal.  ECF No. 60-1 at 49–53.  Under the doctrine of *forum non conveniens*, a "court must decide (1) whether an adequate alternative forum for the dispute is available and, if so, (2) whether a balancing of private and public interest factors strongly favors dismissal."  *Agudas Chasidei*, 528 F.3d at 950.  This Circuit has foreclosed dismissal on *forum non conveniens* grounds in cases similar to this one.  "In *TMR [Energy Ltd. v. State Prop. Fund of Ukraine]*, the D.C. Circuit held that 'the doctrine of *forum non conveniens* does not apply to actions in the United States to enforce arbitral awards against foreign nations' . . . because 'only a court of the United States (or of one of them) may attach the commercial property of a foreign nation located in the United States,' rendering alternative forums inadequate."  *Balkan Energy Ltd. v. Republic of Ghana*, 302 F. Supp. 3d 144, 155 (D.D.C. 2018) (first quoting *BCB Holdings Ltd. v. Gov't of Belize*, 650 F. App'x 17, 19 (D.C. Cir. 2016), then quoting *TMR*, 411 F.3d 296, 303 (D.C. Cir. 2005)).

Defendants correctly point out that *TMR* and the cases that follow it all address confirmation of arbitration awards, rather than recognition of foreign judgments.  ECF No. 60-1 at 52.  Defendants contend that arbitration awards are "subject to a strong federal policy in favor of arbitration," a policy not relevant to Plaintiff's suit seeking recognition of a foreign judgment.  *Id.*  Thus, Defendants argue, *TMR* should be read narrowly to apply only to cases seeking confirmation of arbitration awards.  *Id.*  Plaintiff for its part did not respond to that argument.  *See generally* ECF No. 66 at 53–56.  Nevertheless, the undersigned does not agree with Defendants that *TMR*'s holding is so limited.  The *TMR* court made no mention of the federal policy favoring arbitration

in its *forum non conveniens* discussion.  *See* 411 F.3d at 303–04.  Rather, the Circuit's decision

rested on the simple idea that a defendant seeking dismissal on *forum non conveniens* grounds will

be unsuccessful "if no other forum to which the plaintiff may repair can grant the relief it may

obtain in the forum it chose."  *Id.* at 303.  And that is the case where "only a court of the United

States (or of one of them) may attach the commercial property of a foreign nation located in the

United States" in subsequent proceedings seeking to execute a judgment from a U.S. court con-

firming an arbitral award or, in this case, recognizing a foreign judgment.  *Id.*  Nothing in the

court's decision suggests that its logic should apply only to confirmation of arbitral awards, rather

than to suits seeking to confirm or recognize monetary awards—whether gained through arbitra-

tion or litigation—more generally.

Defendants also argue that the Supreme Court's decision in *Sinochem International Co. v.*

*Malaysia International Shipping Corp.*, 549 U.S. 422 (2007) overruled *TMR*.  ECF No. 60-1 at

50–51.  It did not.  Defendants attempt to suggest that the Court "held" that a suit seeking to attach

foreign assets located in the United States was a "textbook case for immediate forum non conven-

iens dismissal."  ECF No. 60-1 at 51.  That is a mischaracterization of *Sinochem*.  The Supreme

Court's sole holding in *Sinochem* was that a district court need not determine whether it has per-

sonal jurisdiction over a defendant before dismissing on forum non conveniens grounds.  549 U.S.

at 425 ("We hold that a district court has discretion to respond at once to a defendant's *forum non*

*conveniens* plea, and need not take up first any other threshold objection.").  With respect to what

made *Sinochem* a "textbook case for immediate *forum non conveniens* dismissal," the Court ex-

plained that proceedings arising out of the same dispute before the district court were ongoing in

China, and had been for years, and "the gravamen of Malaysia International's complaint,"—that

Sinochem made negligent misrepresentations to the Chinese court in those proceedings—"[was]

an issue best left for determination by the Chinese courts." *Id.* at 435–36.  Those facts are easily

distinguishable from the facts in *TMR*, and the facts here, where a party is neither litigating the

merits of a dispute arising entirely abroad, nor challenging the actions of a foreign court in ongoing

proceedings abroad, but instead is seeking to confirm or recognize a foreign money award in order

to later execute that award in the United States.

Defendants also point to a line in *Sinochem* where the Supreme Court explained that "[t]he

common-law doctrine of *forum non conveniens* 'has continuing application [in federal courts] only

in cases where the alternative forum is abroad.'"  549 U.S. at 430 (alteration in original) (quoting

*Am. Dredging Co. v. Miller*, 510 U.S. 443, 449 n.2 (1994)).  But Defendants do not explain how

this line is in conflict with *TMR*.  Indeed, it is not.  It merely stands for the unremarkable proposi-

tion that, as a result of the federal venue transfer statute (28 U.S.C. § 1404(a)), *forum non conven-

iens* dismissals apply only when the alternative forum is abroad, rather than when the alternative

forum is in a different federal district court.  *See Sinochem,* 549 U.S. at 430 (noting that *forum non

conveniens* only applies where the alternative forum is abroad, and then explaining that "[f]or the

federal court system, Congress has codified the doctrine and has provided for transfer, rather than

dismissal, when a sister federal court is the more convenient place for trial of the action"); *see also

Am. Dredging*, 510 U.S. at 449 n.2 (explaining that, as a consequence of the federal venue transfer

statute, "the federal doctrine of *forum non conveniens* has continuing application only in cases

where the alternative forum is abroad").  Thus, far from overruling *TMR*, this portion of *Sinochem*

merely summarized the different remedies—dismissal or transfer—available depending on where

the alternative forum is located.

Indeed, the D.C. Circuit and district courts have continued to apply *TMR* since *Sinochem*

was decided in 2007 and have expressly rejected the argument that *Sinochem* and *TMR* are in

conflict. *See Gretton Ltd. v. Republic of Uzbekistan*, No. 18-CV-1755, 2019 WL 3430669, at \*6 (D.D.C. July 30, 2019) (noting that "[t]he D.C. Circuit has stood by *TMR Energy's* holding" as recently as 2016 and "[d]istrict courts have time and again applied that holding as well"); *Balkan Energy*, 302 F. Supp. 3d at 155 (rejecting the defendant's argument that *Sinochem* overruled *TMR* and noting that "[c]ounsel for [the defendants] have pressed th[e] exact argument to the D.C. Circuit on other occasions . . . but to no avail"); *BCB Holdings Ltd.*, 232 F. Supp. 3d at 45 (rejecting argument that *Sinochem* overruled *TMR* and explaining that the cases "are not in conflict" because "[i]n *Sinochem*, the Supreme Court held that courts may dismiss a case on *forum non conveniens* considerations before definitively determining jurisdiction," whereas, "in *TMR Energy*, the [D.C. Circuit] did not address the timing of assessing the appropriateness of the forum, but rather, the D.C. Circuit plainly stated that there is no alternative forum that has jurisdiction to attach the commercial property of a foreign nation located in the United States").[19]

Last, Defendants contend that "there is an intra-circuit conflict in D.C. Circuit law with respect to the continuing vitality of *TMR*" (ECF No. 60-1 at 51–52), but the cases Defendants cite to support that argument do not conflict with *TMR*. *Lans v. Adduci Mastriani & Schaumberg LLP* held that an alternative forum is inadequate where the forum is not available to all defendants and, indeed, noted that, although "the alternate forum does not need to have identical causes of action

---

[19] Although Defendants do not make the argument, it is also of no consequence to *TMR's forum non conveniens* analysis that Plaintiff does not yet seek to execute a judgment in this case by attaching Defendants' property and may never be able to do so.  It is enough that Plaintiff may seek to attach Defendants' property in the United States in the future if and when it has a judgment from this Court.  Indeed, the parties did not seek to attach property in *TMR* either. Nevertheless, the Circuit rejected the foreign state's argument that a potential future inability to attach property should weigh in favor of dismissal on *forum non conveniens* grounds, explaining that even if the plaintiff could not seek attachment of the foreign state's property at the time the court confirmed the arbitral award, "having a judgment in hand will expedite the process of attachment" in the future.  *TMR*, 411 F.3d at 303–04 ; *see also Continental Transfer*, 697 F. Supp. 2d at 57 (noting that "[w]here a foreign claimant . . . *may* seek to attach property of the defendant that is located in this country, dismissal on *forum non conveniens* grounds would be inappropriate" (emphasis added)); *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 5 F. Supp. 3d 25, 34 (D.D.C. 2013) (finding that "[e]ven if [the defendant] has no attachable property in the United States at this time 'it may own property here in the future, and [the plaintiff's] having a judgment in hand will expedite the process of attachment'" (internal citation omitted) (quoting *TMR Energy*, 411 F.3d at 303)).

or identical remedies to be deemed adequate," such a forum will be "considered inadequate 'where the remedy offered by the other forum is clearly unsatisfactory.'" 786 F. Supp. 2d 240, 290 (D.D.C. 2011). That, of course, is precisely the basis on which *TMR* was decided: a non-U.S. forum will be inadequate in litigation to confirm an arbitral award because "only a court of the United States (or of one of them) may attach the commercial property of a foreign nation located in the United States." *TMR*, 411 F.3d at 303. *Termorio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P.* concluded that Columbia was an adequate alternative forum for a case raising two claims: one to enforce an arbitral award and one that alleged breach of contract. 421 F. Supp. 2d 87, 91 (D.D.C. 2006). In so finding, the court relied on the fact that Columbian courts had already reviewed and vacated the arbitral award and had also litigated the breach of contract claim; it was therefore clear that the "defendants [were] subject to [Columbian] courts' jurisdiction and that [those] courts [were] available to resolve the disputes." *Id.* at 103. The court did not address the question of whether the foreign courts could provide an adequate remedy. *MBI Group, Inc. v. Credit Foncier Du Cameroun* held that Cameroon was a more appropriate forum for a contract and tort case against the government of Cameroon, arising out of a deal to develop affordable housing in Cameroon and noted, in considering whether Cameroon was an adequate alternative forum, that "[a]n alternative forum is inadequate if the plaintiff will be 'treated unfairly' there." 616 F.3d 568, 570, 574 (D.C. Cir. 2010) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981)). The D.C. Circuit nowhere intimated that the unfairness to a litigant is the *only* basis on which a foreign forum may be considered inadequate. Finally, *D&S Consulting, Inc v. Kingdom of Saudi Arabia* merely explains that where the alternative forum is abroad, *forum non conveniens* dismissal, "rather than transfer," is the appropriate remedy, which, as discussed above, is not in conflict with *TMR*. 322 F. Supp. 3d 45, 49 (D.D.C. 2018).

Accordingly, because the Circuit's reasoning in *TMR* is equally persuasive to suits seeking recognition of a foreign judgment, the Court should deny Defendants' motion to dismiss on *forum non conveniens* grounds.

## IV.  CONCLUSION

The undersigned **RECOMMENDS** that Defendants' motion to dismiss (ECF No. 60) be **DENIED** because Plaintiff has alleged enough facts showing at this point in the proceedings that Defendants explicitly waived their sovereign immunity, has stated an adequate claim for relief, and because Defendants' have failed to show that there is an adequate alternative forum.

*        *        *        *        *

The parties are hereby advised that, under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the report and/or recommendation to which objection is made and the basis for such objections.  The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date:  July 29, 2021

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

56