## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MOHAMMAD HILMI NASSIF & PARTNERS,<br><br>    Plaintiff,<br><br>  v.<br><br>REPUBLIC OF IRAQ, *et al.*,<br><br>    Defendants. | Civil Action No. 1:17-cv-02193 (JMC) |

## <u>MEMORANDUM OPINION</u>

Plaintiff Mohammad Hilmi Nassif & Partners, a Jordanian company, traded with the Republic of Iraq ("the Republic") during the 1990s.[1] In November 1995, Plaintiff entered into a letter agreement ("the Letter") with Iraq's Ministry of Industry and Minerals ("the Ministry") to address a sizeable debt Iraq had amassed. The Republic did not honor its commitments under the Letter. Plaintiff did not sit idly by; its representatives met with Iraqi officials to seek redress. Each official agreed that the Letter legally bound the Republic. They instructed Plaintiff to sue "anywhere" other than the Republic, obtain a judgment, and then present that judgment to the Ministry for payment.

Plaintiff proceeded as instructed. It sued the Republic and the Ministry (collectively, "Defendants") in Jordan in 2010 and obtained a judgment against them for approximately $53

---

[1] Unless otherwise indicated, the formatting of quoted materials has been modified throughout this opinion, for example, by omitting internal quotation marks and citations, and by incorporating emphases, changes to capitalization, and other bracketed alterations therein. All pincites to documents filed on the docket are to the automatically generated ECF Page ID number that appears at the top of each page.

million plus interest. Plaintiff attempted to enforce the judgment by attaching Defendants' assets in Jordan. The Republic resisted and successfully asserted sovereign immunity.

Stymied abroad, Plaintiff sues here to enforce the Jordanian judgment. Defendants have moved to dismiss, raising sovereign immunity as a defense. The Foreign Sovereign Immunities Act (FSIA) deprives federal courts of jurisdiction to hear suits against foreign sovereigns unless a statutory exception to immunity applies. 28 U.S.C. § 1605. Plaintiff claims that two apply here: the waiver and commercial activity exceptions. A Magistrate Judge, in a report and recommendation on Defendants' motion, agreed with Plaintiff on waiver but disagreed as to the commercial activity exception. Defendants object to the report and recommendation's waiver conclusion; Plaintiff filed no objection.

Although this case presents a close question, the Court concludes that Defendants did not make the "clear and unambiguous" waiver of sovereign immunity that the FSIA's waiver exception demands. In addition, the Court concurs with the Magistrate Judge's determination that the commercial activity exception does not apply. As a result, although the Court empathizes with Plaintiff, which has struggled for years to enforce an apparently valid judgment worth over $50 million, the Court lacks subject matter jurisdiction to grant any relief. The Court must therefore grant Defendants' motion and dismiss this case.

## I.     BACKGROUND

### A.  Factual Background

The Court draws the facts from Plaintiff's complaint, "supplemented by undisputed facts evidenced in the record." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

#### 1.   *The Parties' agreement and the Letter*

Plaintiff is a Jordanian company founded by Hilmi Mohammad Nassif. Hilmi Nassif served as the main principal of the company until his death in 1998, at which point his sons—Mohammad

Hilmi Nassif and Abdel Naser Helmi Mohammad Nassif—took over as the main principals. ECF 24-3 at 1; ECF 24-5 at 1–2. Sometime before 1995, Plaintiff "sold various products" to the Republic. ECF 1 ¶¶ 2, 10. The Republic did not pay. *Id.* ¶ 10. To settle the resulting debt, the Republic and the Ministry agreed in November 1995 to deliver 450,000 tons of sulfur and 100,000 tons of urea to Plaintiff. *Id.* ¶ 11; ECF 24-3 at 7. The then-Director General of the Ministry's Economic Department, Yakoub Yousef Shonia, memorialized the agreement in the Letter, dated November 22, 1995. ECF 24-3 at 2–3, 7.

### 2. *Meetings between Plaintiff's representatives and Iraqi officials*

The Republic did not deliver the promised goods. ECF 1 ¶ 13. Over the following decades, Plaintiff's officers and representatives sought redress in a series of meetings with Republic and Ministry officials. Plaintiff relies on oral statements purportedly made by these officials, described in a series of declarations, as establishing a waiver of Defendants' sovereign immunity. The declarations largely do not purport to quote the officials' exact words; the quotations below instead reflect the declarants' summaries of the conversations.

June 1997 with the Minister of Industry and Minerals: In June 1997, Mohammad Helmi Nassif (one of Plaintiff's founder's sons) met twice with then-Minister Adnan Al-Ani in Baghdad to discuss the Letter. ECF 24-3 at 3–4. During the first conversation, "[t]he Minister said that [Plaintiff] had the right to sue Iraq on the Letter, that it had the right to sue Iraq anywhere on this obligation[,] and that Iraq would not object to being sued anywhere." *Id.* at 3. The Minister added that "if the [Plaintiff] was to sue, [Plaintiff] should not sue in Iraq, should stay out of the Arab states[,] and should sue elsewhere." *Id.* During the second conversation the next day, the Minister "reiterated" the points he had made the previous evening. *Id.* at 4.

September 2003 with the President of the Iraqi Governing Council: Six years later, in September 2003, Ibrahim Abu-Hijleh, a friend of Plaintiff's founder, spoke with then-President of

the Iraqi Governing Council Ahmed Chalabi on Plaintiff's behalf. ECF 24-5 at 4–5. After reviewing the Letter, President Chalabi "confirmed that it was indeed an unconditional undertaking and that it was a valid commercial obligation of the Republic." *Id*. at 5. "He agreed that it was [Plaintiff's] right to sue[,] . . . that there was no limitation in the Letter requiring [Plaintiff] to sue in Iraq," and that the Letter "could be enforced against Iraq anywhere." *Id.*

April 2006 with the Ministry's Counsel: Around April 2006, another representative for Plaintiff, Saad Mijbil Ali Hussein Al-Tamimi, met with Yakoub Yousef Shonia, then-Economic Counsel for the Ministry, and another official. ECF 24-6 at 3. At that meeting, Shonia "recalled . . . signing [the Letter] and stated that [Plaintiff] had rights under the Letter." *Id.* Shonia "stated that [Plaintiff] had the right to sue Iraq anywhere to enforce its rights under the Letter, whether in the Middle East, Europe[,] or the United States." *Id.* "Neither . . . Shonia nor [the other official present] stated that Iraq or the Ministry was immune from []suit with respect to . . . the Letter and/or the matter otherwise; in fact, [Shonia] stated that Iraq and the Ministry would have no defense to any such lawsuit." *Id.*

Winter 2008 to 2009 with the Minister of Industry and Minerals: Sometime in the winter of 2008 to 2009, Al-Tamimi met with the then-Minister of Industry and Minerals, Fawzi Franco Hariri. *Id.* During that meeting, Hariri told Al-Tamimi "that he could not do anything for [Plaintiff]." *Id.* To collect, Plaintiff "would have to bring a lawsuit." *Id.* Like other officials, he stated that Plaintiff could "sue Iraq and the Ministry anywhere it wants—including in the Middle East, Europe[,] or the United States—and that, when [Plaintiff] had [a] judgment, Iraq would pay." *Id.* Hariri "did not state that Iraq and/or the Ministry would be immune from such a suit." *Id.*

Winter 2011 to 2012 with the Minister of Industry and Minerals: At some point in the winter of 2011 to 2012, Al-Tamimi met with Minister Hariri's successor, Ahmad Al Karbouli, at

his offices in Baghdad. *Id.* Karbouli confirmed Hariri's statement that "Iraq would not release any money unless the claimant has a court order." *Id.* at 4. In response to Al Tamimi's asking where Iraq would like Plaintiff to sue, he replied that Plaintiff "may sue Iraq and the Ministry anywhere it would like, that Iraq would not and could not dispute the lawsuit at all and then, when the [Plaintiff] obtained the court order, [Plaintiff] should present the court order to Iraq and then Iraq would release the funds." *Id.* Karbouli "did not say that Iraq or its Ministry was immune from []suit." *Id.* Al-Tamimi characterized Karboli's description as the "official procedure" that Plaintiff should follow. *Id.*

### 3.  *Litigation in Jordan*

In 2010 (after all but the last of the conversations described above), Plaintiff sued Defendants for damages in a Jordanian court, alleging that they had not fulfilled their obligations under the Letter. ECF 24-3 at 4. Although the Ministry—but not the Republic itself—appeared to defend the suit, "was represented by legal counsel . . . , presented documentary evidence, called witnesses, made formal arguments, filed legal briefs[,] and even took interlocutory appeals during the . . . [c]ase," ECF 21-2 at 2; *accord* ECF 21-3 at 2; ECF 24-2 at 2, it did not "raise[] any sovereign immunity defense whatsoever" in the trial court, ECF 21-2 at 3; *accord* ECF 24-2 at 3; ECF 21-3 at 3. In 2015 (after all the conversations described above), the trial court "found Defendants liable . . . to Plaintiff in the amount of $53 million," in addition to fees, costs, and post-judgment interest. ECF 21-2 at 3.

The Republic—though not the Ministry—appealed, raising, for the first time, a sovereign immunity defense. ECF 66-1 at 79–81. The Court of Cassation of Jordan, the country's highest appellate court, affirmed the judgment in 2018. *Id.* at 89. In rejecting Iraq's sovereign immunity defense, the court did not reference any oral waiver by Iraqi officials. *Id.* at 88–89. Instead, it observed that the Ministry—a "part of Iraq as a state"—had appeared to defend the action,

effecting a "waiver . . . of . . . immunity," and that sovereign immunity was unavailable because of the private, commercial relationship between Plaintiff and Defendants, which was not "in connection with [Iraq's] activity as an international sovereign personality." *Id.*

Plaintiff sought to enforce this judgment by attaching some of Defendants' property in Jordan. *Id.* at 122–23. In 2016, an appellate court concluded that Defendants had not "waive[d] the[ir] [sovereign] immunity" with respect to the enforcement action as the threshold for "explicit" waiver "[w]as not met." *Id.* at 127–28. As a result, Plaintiff has yet to collect any of the judgment. *Id.* at 6. The Parties' submissions do not clarify whether the Republic and the Ministry, or only the Republic, asserted sovereign immunity in the enforcement action. However, since Plaintiff has not collected, the Republic's successful assertion of sovereign immunity in the enforcement action apparently covered both its and the Ministry's assets.

### B. Procedural Background

On October 23, 2017, Plaintiff filed this suit seeking recognition of the Jordanian court's judgment. ECF 1. After Defendants missed their deadline to respond to the complaint, the Clerk of the Court entered default against them on April 3, 2018. ECF 15. Defendants appeared nearly one year later and filed a motion to dismiss, ECF 28, and a motion to set aside entry of default, ECF 29. The Court referred the case to a Magistrate Judge for full case management. *See* Mar. 26, 2019, Min. Order. The Magistrate Judge issued a report and recommendation recommending that the Court set aside entry of default—in part because Plaintiff had not properly served Defendants with process—and concluding that, once service was properly effected, the Court would have jurisdiction under the FSIA's waiver exception, though not the commercial activity exception. ECF 40 at 15, 25–26. Defendants objected, arguing, among other things, that the waiver exception is inapplicable. ECF 42 at 16. Plaintiff filed no objection. After reviewing the report and recommendation, the Court held that Plaintiff had improperly served Defendants, but granted it

the opportunity to reattempt proper service. *Mohammad Hilmi Nassif & Partners v. Republic of Iraq*, No. 17-cv-2193, 2020 WL 1444918, at *5 (D.D.C. Mar. 25, 2020). The Court set aside the entry of default and denied the remainder of the motion to dismiss as moot. *Id.*

After proper service, Defendants again moved to dismiss. ECF 60. Defendants argued that the Court lacked subject matter jurisdiction because the two FSIA exceptions invoked by Plaintiff—the waiver and commercial activity exceptions—do not apply. ECF 60 at 13. In the alternative, they argued that Plaintiff failed to state a claim upon which relief could be granted and that the case should be dismissed on *forum non conveniens* grounds. *Id.* at 44, 49.

In a second report and recommendation, the Magistrate Judge advised denying the motion. ECF 72. He found that Plaintiff had alleged enough facts to show that Defendants had explicitly waived sovereign immunity. *Id* at 36. He also determined that the commercial activity exception did not apply and therefore recommended granting the motion to dismiss if the Court were to conclude that Defendants did not waive their sovereign immunity. *Id.* at 48. Defendants have objected to the report and recommendation's waiver conclusion. ECF 73. Plaintiff did not file an objection to the Magistrate Judge's holding that the commercial activity exception does not apply.

## II.    LEGAL STANDARD

In considering objections to a magistrate judge's report and recommendation, district courts generally apply a de novo standard of review. 28 U.S.C. § 636(b)(1); LCvR 72.3(c). After reviewing the report and recommendation and any objections, a district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); LCvR 72.3(c). A district court may adopt portions of a report and recommendation to which no party files an objection, *see Thomas v. Arn*, 474 U.S. 140, 152 (1985), and may treat arguments not raised through a timely objection as waived, *see* LCvR 72.3(b); *Taylor v. District of Columbia*, 325 F. Supp. 3d 144, 144 n.3 (D.D.C. 2018).

When moving to dismiss for lack of subject matter jurisdiction in an FSIA case, "the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). "By moving to dismiss, the defendant may challenge either the legal sufficiency or the factual underpinning of an exception." *Id.* Where "the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations," *id.*, the court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting [the] plaintiff the benefit of all [factual] inferences that can [reasonably] be derived from the facts alleged," *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011); *see Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002). A court "may [also] consider . . . undisputed facts evidenced in the record." *Herbert*, 974 F.2d at 197.

Here, Defendants here have not challenged the truth of any of Plaintiff's allegations or objected to the Court's considering Plaintiff's declarations. *See, e.g.*, ECF 73 at 8. The Court therefore treats Plaintiff's allegations and the declarants' statements as true in deciding Defendants' motion.

## III.    ANALYSIS

Defendants raise several arguments in their motion to dismiss, but the Court stops at immunity under the FSIA because it proves dispositive. The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). Foreign states (including their "political subdivisions," like the Ministry, 28 U.S.C. § 1603(a)) are "presumptively immune" from suit unless one of the FSIA's exceptions applies. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *see* 28 U.S.C. § 1604. Plaintiff has, at various points, cited two such exceptions: the waiver and commercial activity exceptions. *See* 28 U.S.C. § 1605(a)(1)–(2). The Court concludes that neither

applies, meaning that Defendants retain their sovereign immunity and the Court lacks subject matter jurisdiction over this case.

### A.  The Waiver Exception Does Not Apply

The FSIA's waiver exception strips a foreign state of immunity where "the foreign state has waived [that] immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). Plaintiff has disclaimed any argument for implicit waiver, *e.g.*, ECF 74 at 26 n.6,[2] so the Court considers only whether Defendants have explicitly waived their sovereign immunity from this suit.

*1.  The Parties' arguments*

In support of its explicit waiver argument, Plaintiff cites the oral statements of five Iraqi officials—Minister Al-Ani, President Chalabi, Counsel Shonia, Minister Hariri, and Minister Karbouli—as described above. Plaintiff has presented these oral statements in the form of paraphrased descriptions in sworn declarations by witnesses to whom the statements were said. *See* ECF 24-3; ECF 24-5; ECF 24-6. Defendants do not dispute the contents of those statements as described in those declarations, at least not at this stage of the litigation. ECF 72 at 13. Instead, Defendants argue that the statements as described do not suffice to explicitly waive their sovereign immunity.

Defendants criticize the oral statements' sufficiency, and object to the report and recommendation's waiver finding, on three fronts. First, Defendants argue that the statements were not clear enough—that they did not "expressly state that [Defendants were] 'waiving' [their] 'immunity' to suit in the United States." ECF 73 at 9 (emphasis omitted). At points in their briefing,

---

[2] Plaintiff's disclaimer makes good sense. The D.C. Circuit has recognized "only three" ways in which a foreign state can implicitly waive its sovereign immunity: "(1) executing a contract containing a choice-of-law clause designating the laws of the United States as applicable; (2) filing a responsive pleading without asserting sovereign immunity; or (3) agreeing to submit a dispute to arbitration in the United States." *Ivanenko v. Yanukovich*, 995 F.3d 232, 239 (D.C. Cir. 2021). Defendants have done none of those things.

Defendants appear to argue that an explicit waiver under the FSIA must say the specific words "waive," "immunity," and "United States." *See, e.g.*, ECF 73 at 8–11; ECF 75 at 4. At other points, Defendants contend that their position does not require "magic words" or "rote language" but instead merely demands that whatever words are used be "precise words" that "express that the sovereign intended to *waive* its *immunity*." ECF 75 at 8 (emphasis in original). Plaintiff counters, consistent with the Magistrate Judge's recommendation, that Defendants' argument, if adopted, would in fact impose a "magic words" requirement that the FSIA's text and caselaw do not impose. ECF 74 at 13–14; *see* ECF 72 at 28–29 (Magistrate Judge finding that "the FSIA does not require magic words like 'waiver' or 'immunity' to effect explicit waiver" and that Defendants' argument therefore fails).

Second, Defendants object that the statements did not waive their sovereign immunity because the statements were not contained in a treaty, written contract, or other writing. ECF 73 at 11–13; ECF 75 at 5–8. Plaintiff responds that the Magistrate Judge was correct in holding that the ordinary meaning of the FSIA's text unambiguously imposes no such requirement and that, even if the statute's text were ambiguous, the legislative history and caselaw also do not evince a writing requirement. *See* ECF 74 at 17–23; ECF 72 at 25–28 (Magistrate Judge's holding).

Third and last, Defendants contend that the Iraqi officials whose statements purportedly waived their sovereign immunity lacked the actual authority to offer such a waiver in the form their statements took (i.e., oral statements outside of a written contract or formal written opinion). ECF 73 at 20–25; ECF 75 at 10–11 ("[N]one of the Iraqi officials had authority to waive immunity orally."). On this question, the Parties offer dueling declarations from experts in Iraqi law, and the

Magistrate Judge found Defendants' expert evidence insufficient to meet their burden to establish lack of actual authority. *See* ECF 72 at 15–25; ECF 60-3; ECF 66-2; ECF 66-3; ECF 67-2.[3]

### 2. *Defendants' first argument prevails*

After careful consideration, the Court agrees with Defendants on their first objection and declines to decide the other two. Ultimately, the statements that Plaintiff's declarations describe fail to meet the stringent test that the FSIA imposes for a finding of explicit waiver. Under the FSIA, explicit waivers are "narrowly construed in favor of the sovereign." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002). A waiver "is not enlarged beyond what [its] language requires," and a foreign state "will not be found to have [explicitly] waived its immunity unless it has clearly and unambiguously done so." *Id.* "An express waiver under section 1605(a)(1) must give a clear, complete, unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity." *Id.* (quoting *Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1292 (11th Cir. 1999)); *see also Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 697 (D.C. Cir. 2022) (explaining that the D.C. Circuit has "consistently concluded that what matters when discerning any . . . waiver of sovereign immunity is the foreign sovereign's actual intent"). Thus, waiver of sovereign immunity must be more than

---

[3] Defendants also argue that the report and recommendation mistakenly treated the oral statements as "an *implied waiver*," rather than an explicit waiver, and that they fail to meet the standards for implied waiver under the FSIA, too. ECF 73 at 8. That argument mischaracterizes the report and recommendation, which acknowledged that Plaintiff had not argued implicit waiver under the FSIA and that, as a result, the Magistrate Judge "need not address implicit waiver." ECF 72 at 9–10 n.9. Throughout the report and recommendation, the Magistrate Judge interpreted and applied only the rules for explicit waiver, not implicit waiver. For Plaintiff's part, the Court observes but rejects Plaintiff's argument that the Court should either decline to consider Defendants' objections to the report and recommendation's conclusion that the waiver exception applies or apply a clear-error standard of review because Defendants' arguments were purportedly too vague or nonresponsive to the report and recommendation. ECF 74 at 12–13. Defendants' arguments are not vague and respond directly to the report and recommendation. *See generally* ECF 73. And, in any event, arguments against sovereign immunity cannot be waived and can be raised for the first time even on appeal, so there is no reason the Court should not review them *de novo* at this stage. *See, e.g.*, *World Wide Minerals*, 296 F.3d at 1161 n.7.

a "possible construction" of the foreign state's statement. *Bainbridge Fund Ltd. v. Republic of Argentina*, 102 F.4th 464, 471 (D.C. Cir. 2024).

This case tugs at the seams of that stringent rule. Indeed, the Parties offer no case—and the Court has not found one—whose alleged explicit statements of waiver look like the statements here. Instead, on one side sit a slew of cases with statements that include some combination of the words "waive," "immunity," "jurisdiction" and "United States."[4] In those cases, courts typically find explicit waiver of sovereign immunity to sue in U.S. courts. On the other end of the spectrum, several cases have found no explicit waiver based on statements that are either clearly silent on sovereign immunity or include words that contradict an intent to waive such immunity.[5] The

---

[4] *See, e.g.*, *World Wide Minerals*, 296 F.3d at 1162 & n. 13 ("In respect of any arbitration or legal action or proceedings arising out of or in connection with this Agreement, . . . [the Kazakhstan State Committee] hereby irrevocably agrees not to claim and hereby irrevocably waives . . . immunity for itself and the assets of the Republic of Kazakhstan to the full extent permitted by the laws of such jurisdiction"); *Proyecfin de Venezuela, S.A. v. Banco Indus. de Venez., S.A.*, 760 F.2d 390, 393 (2d Cir.1985) ("Borrower. . . hereby waives such immunity . . . and . . . in any proceedings taken in New York the foregoing waiver of immunity shall have effect and be construed in accordance with the United States Foreign Sovereign Immunities Act [of] 1976."); *Cap. Ventures Int'l v. Republic of Argentina*, 552 F.3d 289, 291–92 (2d Cir. 2009) ("To the extent that the Republic has or hereafter may acquire any immunity (sovereign or otherwise) from jurisdiction of any court or from any legal process . . . the Republic hereby irrevocably waives such immunity in respect of its obligations under the Bonds."); *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1177 (5th Cir. 1989) ("The Borrower . . . expressly and irrevocably waives any such right of immunity (including any immunity from the jurisdiction of any court or from any execution or attachment in aid of execution prior to judgment or otherwise) or claim thereto which may now or hereafter exist, and agrees not to assert any such right or claim in any such action or proceeding, whether in the United States or otherwise."); *Walker Int'l Holdings Ltd. v. Republic of Congo*, 395 F.3d 229, 234 (5th Cir. 2004) ("The Congo hereby irrevocably renounces to claim any immunity during any procedure relating to any arbitration decision handed down by an Arbitration Court.").

[5] *See, e.g.*, *Argentine Republic*, 488 U.S. at 442–43 & n.10 (finding no waiver in international agreements "that contain[] no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States," and where the international agreement stated, for example, "that a warship may only board a merchant ship if it has a 'reasonable ground for suspecting' the merchant ship is involved in piracy, the slave trade, or traveling under false colors" and that "[i]f an inspection fails to support the suspicion, the merchant ship 'shall be compensated for any loss or damage that may have been sustained.'"); *Ivanenko*, 995 F.3d at 240 ("A national or company of either Party that asserts that all or part of its investment has been expropriated shall have a right to prompt review by the appropriate judicial or administrative authorities of the other Party" and "an individual or company may resolve an investment dispute involving a signatory nation in 'the courts or administrative tribunals of the Party that is a party to the dispute.'"); *World Wide Minerals*, 296 F.3d at 1162–63 (finding no waiver for two agreements that did not "describe[] the kind of claims for which Kazakhstan waived immunity" and included other provisions "that suggest Kazakhstan did *not* contemplate that disputes over those agreements would be resolved in United States courts, but rather by arbitration in Kazakhstan and Sweden.").

statements in the instant case fall somewhere in the middle. This case thus asks how far along that spectrum a statement can travel before it ceases to be an explicit waiver. The Court's answer here, in short, is "not very far."

As an initial matter, the Court agrees with Plaintiff and the Magistrate Judge that the FSIA does not impose a "magic words" requirement and thus rejects the most strident interpretation of Defendants' argument. ECF 72 at 29. The text of the FSIA requires only a finding that that the "foreign state has waived its immunity . . . *explicitly*." 28 U.S.C. § 1605(a)(1) (emphasis added). And when interpreting a statutory term, courts typically look to the term's "ordinary meaning at the time Congress enacted the statute," often as evidenced by contemporaneous dictionary definitions. *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018). Accordingly, the FSIA's term "explicitly" requires that the waiver be "[n]ot obscure or ambiguous, having no disguised meaning or reservation," and "[c]lear in understanding." *Explicit*, Black's Law Dictionary 519 (5th ed. 1979). Relying upon that definition, the Second Circuit has interpreted a parallel FSIA explicit waiver provision not to require "recitation" of specific words "as an operative formula." *Libra Bank, Ltd. v. Banco Nacional de Costa Rica, S. A.*, 676 F.2d 47, 49 (2d Cir. 1982). Instead, all an "explicit" waiver requires is words that "evince[] a clear and unambiguous intent" to waive sovereign immunity. *Id.* As the Second Circuit put it in another case, the purpose of § 1605(a)(1)'s "explicitly" requirement was "to preclude inadvertent, implied, or constructive waiver in cases where the intent of the foreign state is equivocal or ambiguous." *Cap. Ventures*, 552 F.3d at 293. The Court declines to impose a harsher requirement for waiver than the statutory text, under its ordinary meaning, demands.[6]

---

[6] Rejecting a "magic words" requirement in the FSIA context also aligns with the Supreme Court's treatment of other forms of sovereign immunity, which generally requires clear and unambiguous waiver but does not require specific magic words. *See, e.g.*, *FAA v. Cooper*, 566 U.S. 284, 291 (2012) (requiring "an unmistakable statutory expression of

Even so, Defendants do not need a "magic words" requirement to win here. As Defendants aptly summarize the rule in their reply, a sovereign need not use the specific words "waiver" or "immunity"; but "whatever other words are used must express the waiver of immunity in a clear and unambiguous way." ECF 75 at 8. Put another way, "while the FSIA does not require specific words, it requires the use of *precise* words to express that the sovereign intended to waive its immunity." *Id* (emphases altered). The statements here are not sufficiently precise to express such an intent, particularly when "narrowly construed in favor of the sovereign" and not "enlarged beyond what [their] language requires." *Wye Oak*, 24 F.4th at 691.

First, several of the key statements relied on by Plaintiff are reasonably—if not best—read as statements about the validity and enforceability, on the merits, of the Letter Agreement between Plaintiff and Defendants, rather than as statements about waiver of immunity. For instance, then-Minister Al-Ani's statement that Plaintiff "had the right to sue Iraq on the Letter . . . anywhere . . . and that Iraq would not object to being sued anywhere" immediately followed Al-Ani's assurance to Plaintiff that the Letter "was an unconditional undertaking." ECF 24-3 at 3. In a second meeting the next day, Al-Ani restated his previous statement and also assured Plaintiff's witnesses that Plaintiff "should not worry because Iraq never reneges on its obligations." *Id.* at 4. Then-President Chalabi repeated this sentiment in the September 2003 meeting when, upon reviewing the Letter, he "confirmed that it was . . . an unconditional undertaking and that it was a valid commercial obligation of the Republic of Iraq." ECF 24-5 at 5. Thus, Chalabi "agreed

_____

congressional intent to waive the [U.S.] Government's [sovereign] immunity," but clarifying that "Congress need not state its intent in any particular way" and that "[w]e have never required that Congress use magic words"); *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 388 (2023) (stating that the clear-statement rule for waiver of tribal sovereign immunity "is not a magic-words requirement"). And the D.C. Circuit has equated the standard for FSIA waiver with these other forms of sovereign immunity waiver. *See, e.g.*, *World Wide Minerals*, 296 F.3d at 1162 & n.12 (quoting cases involving waiver of federal, state, and tribal sovereign immunity when reciting the standard for explicit waiver under the FSIA).

that it was the Company's right to sue" if Iraq did not meet its obligation. *Id.* And although Chalabi did then state that the Letter "could be enforced against Iraq anywhere," he did so after just having read the Letter for the first time and observing "that there was no limitation in the Letter requiring the Company to sue in Iraq." *Id.* All told, then, Chalabi's statements need not be interpreted as anything more than observations that (a) the Letter was an enforceable agreement, and (b) the Letter did not contain a restriction on where it could be enforced. The "language" of those statements need not be "enlarged" into a waiver of sovereign immunity, even if they arguably could be under a looser standard. *Wye Oak*, 24 F.4th at 691.

Ministry Counsel Shonia's April 2006 statements that Plaintiff "had rights under the Letter," that Plaintiff "had the right to sue Iraq anywhere to enforce its rights under the Letter, whether in the Middle East, Europe or the United States," and that "Iraq and the Ministry would have no defense to any such lawsuit." can easily be read to communicate nothing more than those same two points. ECF 24-6 at 3. Although Plaintiff's witness, Al-Tamimi, declared that "[n]either Shonia nor [the other official at the meeting] stated that Iraq or the Ministry was immune from lawsuit with respect to its obligations in the Letter," he did not recount any actual statements about immunity either way. Thus, Shonia's statements need not be read to waive sovereign immunity either.

The final two statements come closest to the line, but they still fall short of clear and unambiguous waiver. Minister Hariri's statements in the "winter of 2008-2009" meeting with witness Al-Tamimi seemed to spell out a specific process by which Plaintiff could recover under the Letter: "sue Iraq and the Ministry anywhere it wants—including in the Middle East, Europe or the United States" and "when [Plaintiff] had the judgment, Iraq would pay." *Id.* Hariri's successor, Karbouli, restated that process in a meeting in "the winter of 2011-2012"—stating that Plaintiff

"may sue Iraq and the Ministry anywhere it would like, that Iraq would not and could not dispute the lawsuit at all and then, when [Plaintiff] obtained the court order, [it] should present the court order to Iraq and then Iraq would release the funds." *Id* at 4. And Al-Tamimi described this as "the official procedure" by which Iraq would "release [the] money" it owed Plaintiff. *Id.* But again, as Al-Tamimi recounted, neither Hariri nor Karbouli said anything about immunity either way—nor, apparently, did the issue of sovereign immunity come up at either meeting. *See id.* at 3–4. Thus, Karbouli's statement that Iraq "would not and could not dispute [such a] lawsuit" filed in "the Middle East, Europe, or the United States," narrowly construed, at least plausibly referred only to the suit's merits and the Letter's lack of explicit venue limitations, even considering Karbouli's reference to other countries where Plaintiff might file suit. Perhaps that interpretation seems unlikely. But the law does not permit this Court to pick the most likely interpretation of ambiguous statements; rather, the law demands a clear and unambiguous statement. Both individually and taken together, the statements upon which this Court's jurisdiction would rely, if it allowed this case to proceed, are ambiguous.

Finally, the statements' format enhances their ambiguity. Although those statements would almost certainly be too ambiguous if they were verbatim quotes or parts of a complete writing, the statements here are neither. Instead, they all take the form of paraphrases and summaries provided by witnesses to whom the statements were made, in declarations executed years—if not decades— later. To be sure, Defendants do not challenge the declarations' descriptions of the statements, and the Court has no occasion to question their accuracy. But the lack of evidence as to the specific wording used to purportedly waive sovereign immunity, and the context of those statements within other statements made in those meetings, makes it hard to deem the statements "a clear, complete, unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity."

*World Wide Minerals*, 296 F.3d at 1162. Put another way, the lack of such evidence leaves too much room for ambiguity and mistake. And indeed, the caselaw applying the FSIA's explicit waiver rule uniformly scrutinizes the specific words used—and not used—when assessing whether a foreign state's statement constitutes a waiver. *See supra* notes 4 & 5. Paraphrases and summaries of oral statements inhibit such an analysis.

This is not to say that an explicit waiver necessarily requires a writing; Plaintiff and the Magistrate Judge make a compelling case that the FSIA imposes no such requirement. *See* ECF 72 at 26–27; ECF 74 at 17–23. For instance, transcripts or recordings of the meetings at issue here, or even detailed contemporaneous notes, could have evinced the precise wording that Plaintiff believes waived immunity and enabled the Court to analyze them in full, even without Defendants having reduced them to writing. But there is a reason neither the Parties nor the Magistrate Judge found another case involving alleged oral waiver of sovereign immunity. Such statements, unless precisely recorded, struggle to overcome the FSIA's demand for clarity, completeness, and lack of ambiguity.

In sum, on the record before the Court, Defendants did not explicitly waive their sovereign immunity to Plaintiff's suit.

**B.  The Commercial Activity Exception Does Not Apply**

Even if the waiver exception does not apply, Plaintiff argues, the Court has subject matter jurisdiction under the FSIA's commercial activity exception. *See* ECF 66 at 38. The Court disagrees with Plaintiff and agrees with the Magistrate Judge on that issue.

The FSIA's commercial activity exception provides:

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based [(1)] upon a commercial activity carried on in the United States by the foreign state; or [(2)] upon an act performed in the United States in connection with a commercial

activity of the foreign state elsewhere; or [(3)] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). Plaintiff pointed to the third clause of this exception. *See* ECF 66 at 38–40. That clause has three requirements: "1) the lawsuit must be based upon an act that took place outside the territory of the United States; 2) the act must have been taken in connection with a commercial activity[;] and 3) the act must have caused a direct effect in the United States." *Yang Rong v. Liaoning Province Gov't*, 452 F.3d 883, 888–89 (D.C. Cir. 2006).

The Magistrate Judge concluded that the commercial activity exception does not apply here because this suit is "based upon" the Jordanian judgment and "Plaintiff d[id] not dispute that the . . . judgment," as opposed to the underlying Letter, "is not an act to which [the commercial activity exception] applies." ECF 72 at 36. The Court agrees: this case is "based upon" the Jordanian judgment and Defendants' nonpayment thereof. Because those acts did not have any direct effects in the United States, the commercial activity exception does not apply.

1. *This case is "based upon" the Jordanian judgment and Defendants' failure to pay it*

The FSIA does not define the term "based upon." But precedent offers some interpretive guidance, albeit in the context of the commercial activity exception's first two clauses. In *Saudi Arabia v. Nelson*, the Supreme Court held that, in the exception's first clause, "the phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." 507 U.S. at 357. Applying this definition, the Court concluded that a claim for wrongful arrest, imprisonment, and torture by Saudi Arabian police was "based upon" the facts underlying those tortious claims, and not the recruitment of plaintiff to, and employment in, Saudi Arabia that preceded his horrific experience. *Id.* at 358. The Supreme Court further refined this approach in *OBB Personenverkehr AG v. Sachs*, by instructing courts to identify "the

particular conduct that constitutes the gravamen of the suit" and "zero[] in on the core of [the plaintiff's] suit." 577 U.S. 27, 35 (2015).

The D.C. Circuit has extended this reading of "based upon" to the second clause of the commercial activity exception, and its reasoning in doing so supports taking the same approach to the third clause. As the D.C. Circuit explained, "the virtually identical statutory text and structure of clauses one and two" favor interpreting the two clauses synonymously. *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 37 (D.C. Cir. 2014).[7] The third clause shares the same text and structure as the first two clauses, and therefore the Court determines that "based upon" has the same meaning across all three clauses. The gravamen of Plaintiff's complaint determines what this case is "based upon."

Plaintiff's sole claim is for recognition and enforcement of the Jordanian judgment under the District of Columbia's Uniform Foreign-Country Money Judgments Recognition Act. *See* D.C. Code §§ 15-361–15-371; ECF 1 ¶¶ 1, 20–22. The elements of a claim for recognition of a foreign judgment under this statute are: "(1) the foreign court had personal and subject matter jurisdiction over the defendant and underlying subject matter; (2) the foreign court had sufficient due process safeguards; and (3) a fully enforceable judgment exists in the foreign country." *Valambhia v. United Republic of Tanzania*, No. 18-cv-370, 2019 WL 1440198, at *3 (D.D.C. Mar. 31, 2019), *aff'd*, 964 F.3d 1135 (D.C. Cir. 2020) (citing D.C. Code §§ 15-363(a), 15-364(b)). Plaintiff does not ask the Court to reconsider the merits of the Jordanian judgment, and nothing in the merits of

---

[7] In *Rosenkratz v. Inter-American Development Bank*, the D.C. Circuit clarified that *Sachs* forecloses any possibility that *Odhiambo* could be understood to support an element-by-element approach to the gravamen analysis—which would allow "a plaintiff's pleading decisions [to] dictate a court's jurisdiction." 35 F.4th 854, 863 (D.C. Cir. 2022). Instead, *Rosenkrantz* explained, *Sachs* directs courts to "examine the plaintiff's asserted claims and zero in on the wrongful conduct on the part of the defendant that actually injured the plaintiff." *Id.* But *Rosenkratz* did not disagree with *Odhiambo*'s holding that the first and second clauses share the same meaning of "based upon" due to their identical text and structure.

this case would turn on Defendants' conduct underlying that judgment. The "core" of Plaintiff's suit is the Jordanian judgment and Defendants' failure to pay it. *Sachs*, 577 U.S. at 35. For purposes of the commercial activity exception, those are the relevant acts. *Accord Valambhia*, 2019 WL 1440198, at *3–4 (holding that, because "the underlying commercial conduct . . . is not an element of a claim for recognition of a foreign judgment or a fact without which the plaintiff will lose," the commercial activities exception is inapplicable to such a claim).

Plaintiff urges the Court to consider the commercial conduct underlying the Jordanian judgment. *See* ECF 66 at 38–40. But *Nelson* and *Sachs* counsel against considering activities that preceded the basis of a plaintiff's claim. In *Nelson*, the Court declined to consider recruitment activities that occurred in the United States because they did not support any element of the plaintiff's complaint. 507 U.S. at 358. Although *Sachs* later rejected an element-by-element approach to the "based upon" analysis, that case still limited its inquiry to facts that could advance the plaintiff's claims (i.e., "the . . . sovereign acts that actually injured [the plaintiff]"). *Sachs*, 577 U.S. at 34–36. Similarly, here, the Court looks only at facts that could support the merits of Plaintiff's claim. Even accepting Plaintiff's allegations about the underlying conduct as true, "those facts alone entitle [Plaintiff] to nothing under their theory of the case" for recognition under the D.C. Recognition Act. *Sachs*, 577 U.S. at 35 (quoting *Nelson*, 507 U.S. at 358). Therefore, the basis for Plaintiff's complaint is the Jordanian judgment and Defendants' failure to pay it.

Plaintiff contends that this interpretation of "based upon" conflicts with caselaw from the Second Circuit. In at least two cases, the Second Circuit "look[ed] to the underlying conduct that gave rise the judgment" when applying the commercial activity exception to an action for recognition of a foreign judgment. *SerVaas Inc.*, 653 Fed. App'x at 23–24; *see also Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 389 (2d Cir. 2000)

(noting that prior case law is "inconsistent" with the idea that a claim to recognize a foreign judgment is not "based upon" the underlying commercial conduct). But the Second Circuit determined that this was the correct approach only by relying on a case decided before *Nelson* and *Sachs*, and the Second Circuit conceded that these later-decided cases created "some tension" with its approach. *Transatlantic*, 204 F.3d at 389 & n.4 (citing *Int'l Hous. Ltd. v. Rafidain Bank Iraq*, 893 F.2d 8, 11–12 (2d Cir. 1989)); *see also SerVaas*, 653 Fed. App'x at 24 (same). This Court respectfully reaches the opposite conclusion from the Second Circuit and finds the tension to be untenable in light of *Nelson* and *Sachs*.

Further, Plaintiff argues that excluding conduct underlying a foreign judgment from the "based upon" analysis will "render the third clause of the FSIA meaningless." ECF 66 at 40. The Court is confident that the third clause will survive by finding application in cases not involving recognition of foreign court judgments, just as it has been applied in such cases in the past. *See, e.g.*, *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611–12, 620 (1992) (finding subject matter jurisdiction under the FSIA's third clause where the case was based upon a foreign state's issuance of government-backed bonds); *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 345, 349 (D.C. Cir. 2018) (finding subject matter jurisdiction under the FSIA's third clause where the case was based upon a foreign company's alleged fraud that targeted U.S. investors); *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Can.*, 600 F.3d 661, 664–65 (D.C. Cir. 2010) (finding that the termination of a contract with a U.S.-based corporation providing cruise ships from the United States had a direct effect in the United States under the FSIA's third clause). True, precluding consideration of the underlying commercial activity makes it unlikely (though perhaps not inconceivable) that the FSIA's third clause will apply in a case seeking recognition of a foreign judgment. But that result is not as radical as Plaintiff suggests. If the

21

underlying activity is commercial in nature, then plaintiffs presumably could demonstrate the applicability of an FSIA exception in a case "based upon" that activity itself, rather than using that activity as the basis for a lawsuit in a foreign court before coming to a U.S. court for recognition and enforcement.

To be sure, as Plaintiff notes, "courts . . . have disagreed . . . over whether an action to enforce a foreign judgment is 'based upon' only the judgment or also upon a foreign state's commercial conduct from which the judgment arises, and therefore, whether the commercial activity exception would apply to an enforcement action." ECF 74 at 33. *Compare, e.g.*, *SerVaas*, 653 F. App'x at 23–24 (looking to underlying conduct), *with Valambhia*, 2019 WL 1440198, at *3–4 (looking to judgment). Indeed, on appeal of *Valambhia*, the D.C. Circuit declined to decide whether "as a categorical matter, *any* suit brought on a foreign judgment—rather than on the conduct that underlies that judgment—is too distant to satisfy this [commercial activity] exception." *Valambhia*, 964 F.3d at 1144. But the Court agrees with the Magistrate Judge that Judge Chutkan's reasoning in *Valambhia* "is persuasive." ECF 72 at 39. For the reasons discussed in *Valambhia* and those provided above, the Court concludes that the gravamen of Plaintiff's suit is the Jordanian judgment and Defendants' failure to pay it, and therefore it is those acts that must satisfy the commercial activity exception's requirements.

### 2. *The Jordanian judgment and Defendants' nonpayment thereof did not cause any direct effect in the United States*

For the commercial activity exception's third clause to apply, the acts outside the United States upon which this suit is based—the Jordanian judgment and Defendants' nonpayment thereof—must "have been taken in connection with a commercial activity" and "have caused a direct effect in the United States." *Yang Rong*, 452 F.3d at 888–89. The Court concludes that, even

if the acts were connected to a commercial activity, they caused no "direct effect in the United States," and so the commercial activity exception is inapplicable.

For purposes of the FSIA's commercial activity exception, an effect in the United States is "direct" if it follows as an "immediate consequence of the defendant's activity." *Republic of Argentina*, 504 U.S. at 618. "The effect need not be substantial nor foreseeable, but it must not be purely trivial or remote and attenuated." *Valambhia*, 964 F.3d at 1140.

Notably, Plaintiff has not explained what direct effect the judgment and Defendants' nonpayment thereof could have had in the United States. On the contrary, Plaintiff appears to concede that the exception does not apply if this suit is "based upon" the judgment. ECF 74 at 23 (stating that courts have "disagreed . . . over whether an action to enforce a foreign judgment is 'based upon' only . . . the judgment . . . *and therefore . . . whether the commercial activity exception would apply to an enforcement action*" (emphasis added)); *see also* ECF 66 at 40–49 (asserting only that the underlying conduct, and not the judgment, had direct effects in the United States).

Nor can the Court discern any direct effect of the judgment and nonpayment in the United States. The judgment did not contemplate performance or payment in the United States (or even in American currency). *See Valambhia*, 964 F.3d at 1141–42. None of the parties involved were American—and, even if they were, that fact would not necessarily be enough to create a direct effect. *See id.* at 1142–43. The only apparent consequence in this country was Plaintiff's filing of this suit. But Plaintiff's independent, unilateral decision to sue here is an intervening event that breaks the causal chain. *See Odhiambo*, 764 F.3d at 41 (distinguishing direct effects from indirect effects based on "intervening" decisions made independently by a plaintiff); *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994) (explaining that a "direct effect" under

this FSIA exception is "one which has no intervening element, but, rather, flows in a straight line without deviation or interruption"). Because the Jordanian judgment and Defendants' failure to pay it did not cause any direct effect in the United States, the commercial activity exception does not apply.[8]

In addition, it bears notice that Plaintiff arguably waived any argument against the report and recommendation's conclusions on the commercial activity exception by failing to object to that (or any) portion of the report and recommendation within fourteen days. *See* LCvR 72.3(b); *Taylor*, 325 F. Supp. 3d at 144 n.3; *see also NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (explaining that "arguments in favor of subject matter jurisdiction can be waived"). Plaintiff belatedly raised the issue in its response to Defendants' objections (filed twenty-eight days after the report and recommendation), but even then did not expressly object to the report and recommendation's conclusion. Instead, Plaintiff stated only that "[s]hould the Court reconsider this legal issue, Plaintiff stands on its argument." ECF 74 at 24. Still, the Court can understand why Plaintiff may not have decided to object to a report and recommendation in which it otherwise prevailed, and the Court does not need to decide this question of waiver because Plaintiff's argument on the commercial activity exception fails on its merits.

## IV.   CONCLUSION

Neither the waiver exception nor the commercial activity exception applies in this case. Defendants therefore retain their sovereign immunity, and so the Court lacks subject matter jurisdiction over the case.

---

[8] Because the Court concludes that this suit is "based upon" the Jordanian judgment and Defendants' failure to pay it, it need not and does not express any view on the report and recommendation's alternative conclusion that, if the suit were "based upon" the underlying conduct, the commercial activity exception would apply. *See* ECF 72 at 40–48.

The Court respectfully **ADOPTS** the Magistrate Judge's report and recommendation in part, **REJECTS** it in part, and **GRANTS** Defendants' motion to dismiss.

A separate order accompanies this memorandum opinion.

_____
JIA M. COBB
United States District Judge

Date: December 2, 2024